[Cite as *State v. Arnold*, 2013-Ohio-5336.]

### IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

STATE OF OHIO

     Plaintiff-Appellee

v.

CHINA ARNOLD

     Defendant-Appellant


Appellate Case No.    24687

Trial Court Case No.   2006-CR-4928

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

### O P I N I O N

Rendered on the 6th day of December, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

CHRISTOPHER W. THOMPSON, Atty. Reg. No. 0055379, 130 West Second Street, Suite 1444, Dayton, Ohio 45402
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, China Arnold, appeals from her conviction and sentence on a charge of Aggravated Murder. Following a trial, the jury found Arnold guilty of Aggravated Murder. The jury then rejected the death penalty and unanimously voted to recommend imposition of life in prison without the possibility of parole. The trial court imposed the life sentence that the jury had recommended.

{¶ 2} Arnold contends that the trial court erred in overruling her motion to dismiss the death-penalty specification, in violation of her Fifth Amendment right against double jeopardy. Arnold further contends that the trial court erred in failing to instruct the jury on the lesser-included offense of Reckless Homicide. In addition, Arnold maintains that the trial court erred in permitting the State to use a peremptory challenge in a racially discriminatory fashion, in violation of the Equal Protection Clause of the United States and Ohio Constitutions.

{¶ 3} Arnold also argues that the trial court erred in refusing to allow her to present a complete defense. Finally, Arnold contends that the prosecution engaged in a pattern of misconduct that violated her right to due process and a fair trial, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

{¶ 4} We conclude that the trial court did not err in overruling Arnold's motion to dismiss the death penalty specification. The fact that the jury deadlocked in the penalty phase of Arnold's prior trial did not constitute an acquittal for double jeopardy purposes.

{¶ 5} We further conclude that the trial court did not abuse its discretion in refusing to instruct the jury on Reckless Homicide, because the evidence presented at trial would not reasonably support both an acquittal of Aggravated Murder and a conviction upon the lesser

included offense of Reckless Homicide. The trial court also did not err in overruling a defense objection to the State's use of its second peremptory challenge. The court's ruling on the State's alleged discriminatory intent is not clearly erroneous.

**{¶ 6}** In addition, we conclude that the trial court did not err in failing to allow Arnold to present a complete defense. The trial court's decision to limit hearsay testimony was consistent with accepted Rules of Evidence and due process considerations. Finally, Arnold was not deprived of a fair trial based on a pattern of prosecutorial misconduct. Any misconduct did not so infect Arnold's trial with unfairness that her convictions came in violation of the right to due process. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 7}** On August 30, 2005, China Arnold and Terrell Talley arrived at Children's Medical Center at about 7:15 a.m., with their 28-day-old female child, Paris Talley. The baby had a temperature of 95 degrees, and had no pulse, respiration, or blood pressure when she arrived at the hospital. After trying to resuscitate Paris for about 15 minutes, hospital personnel pronounced her dead.

**{¶ 8}** Hospital personnel were mystified and puzzled by the baby's injuries. The baby had burns, but they were not like the scalding or liquid burns normally seen. During the attempts to revive Paris, the parents were in the room. The father was upset and was crying, and Arnold shouted out that her baby was not burned, that its skin was peeling off. Another unusual factor was that Paris was dressed in a clean nightgown. However, based on her injuries, the garment should have contained seepage and skin.

{¶ 9}    When Arnold was asked at the hospital about what had happened, she said that she had arrived home at 2:00 a.m., and had tried to feed Paris, but Paris would not drink. Paris felt warm to the touch, so Arnold placed her in a bassinet and put a fan on her. When Arnold got up in the morning, Paris was not acting right, so she brought the baby to the hospital after getting her other children ready for school, placing them on the bus, and calling Talley.

{¶ 10}    Both Arnold and Talley were taken to the police station from the hospital. Contrary to her earlier statement, Arnold said during her police interview that she had arrived home at 9:30 or 10:00 p.m. the prior evening, and had been sleeping in the living room with Paris on her chest. When Paris's crying woke her at around 2:30 a.m., she heated a bottle in the microwave oven and fed Paris. After changing the baby's diaper, she laid down on the couch, put the baby back on her chest, and went to sleep. Arnold stated that when she woke up in the morning, Talley was on the couch with her, and she did not know where Paris was, but thought Talley had put Paris in the bassinet, which was upstairs.

{¶ 11}    Talley told the police that he arrived home between 3:00 and 4:00 a.m., and laid down on a small couch. After sleeping for a bit, Talley moved to a large couch where Arnold was sleeping. When he woke up in the morning, he found the baby dead, face down on a large couch in the corner.

{¶ 12}    In the meantime, the police had received consent to search the apartment where Arnold and Talley lived with Paris and Arnold's other three children. Prior to the search, the police knew that Paris had been burned, but they did not know the cause of the burns. During the search, Detective Deborde learned from the coroner that the burns had been caused by some type of thermal injury. Nonetheless, the burns had not been caused by anything with which the police

were familiar. The burns were clearly defined and some areas were severely burned; others were spared entirely. For example, Paris's full back had been spared. As a result, when Deborde went back to the scene of the search, he looked for a cookie tin, heating pad, or something that was rectangular that could have caused the burns. The police saw the microwave oven on the counter, but did not suspect that it had been involved.

{¶ 13} The police did find a plastic tub upstairs with cloudy water and what looked like sediment. This material was taken from the house. Otherwise, the search of the house was essentially negative. The police also talked to people in the neighborhood, and learned that Talley's sister, Leonda, had watched Arnold's children the night before Paris died.

{¶ 14} When Arnold was told that Leonda had watched the children, she acknowledged that she and Talley had gone out for a couple of hours, starting around 7:00 p.m. on August 29, 2005. After arriving back home, Arnold stayed outside for a bit and then came into the house between 9:30 and 10:00 p.m. Arnold stated that Leonda was there when she came home. After coming home, Arnold fed Paris a bottle. She said Paris felt hot and she laid her down. Arnold then repeated the story she had already given about waking up at 2:30 in the morning and later going to the hospital.

{¶ 15} By the time of Arnold's third interview on August 30, 2005, the police knew that Arnold had been seen outside on her porch at 4:00 a.m., that she had been arguing with Terrell Talley earlier that evening, and that a plastic tub of water had been found. At that point, Arnold said that she had bathed Paris at noon and had not emptied the water.

{¶ 16} Arnold first said that she and Talley had been arguing about her driving, but later admitted that they were arguing about Paris's paternity. Arnold also initially denied being on the

porch at 4:00 a.m., but eventually admitted it. Arnold said she was waiting for Talley to come home. Arnold then told the police that she was waiting because Talley had taken Paris with him earlier. When Arnold was asked why she had not said anything about that earlier, Arnold stated that she loved Talley and was protecting him. She did not respond when the police asked her about Talley having handed her a burned baby when he returned.

{¶ 17}   Talley was allowed to leave the police station that day, and Arnold was arrested for child endangering, because she was apparently the only one home at the time of the baby's injury. At that time, the coroner still had no idea how the baby's death had been caused, other than that it was due to an elevated temperature caused by thermal injuries. Arnold was released from jail a few days later.

{¶ 18}   In early 2006, the coroner became aware of children that had been allegedly injured by microwave ovens, and of microwave experiments that had been done on pigs that were about the same size as a small baby. The coroner was also alerted to a case in Virginia, in which an infant had been found deceased inside a microwave. Upon investigation, the coroner discovered that the burns in the two cases were very similar.

{¶ 19}   Subsequently, on May 18, 2006, the police returned to 415 Hall Avenue, where Arnold and her family had been living at the time of the death. Although the apartment had been abandoned, the microwave oven was still there. After testing was conducted, an examiner from the Miami Valley Crime Lab found a partial DNA profile from the ceiling of the microwave oven that matched Paris. Arnold was excluded as a source of the DNA. The coroner also tested the microwave oven and concluded that a baby of Paris's size could fit in it. In addition, the coroner concluded that the burn pattern on Paris was consistent with the heating element of the oven,

which was located on the dome or roof of the inside part of the oven. According to the coroner, Paris was placed on her back and was faced up toward the heating element. The coroner concluded that Paris died no earlier than 1:00 a.m., and not significantly later than 3:00 a.m., on August 30, 2005.

{¶ 20} On November 27, 2006, Arnold was arrested for the aggravated murder of Paris. She was then indicted in December 2006 for Aggravated Murder, together with a specification that she had purposely caused the death of another who was under the age of 13 at the time of the offense, and was the principal offender in the commission of the offense.

{¶ 21} A jury trial was conducted during January and February 2008, but the trial court granted a mistrial during the trial, based on the surprise discovery of alleged exculpatory evidence. The newly-discovered evidence was based on allegations that D.T., Arnold's nephew, had placed the baby in the microwave oven and had turned it on. *See State v. Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 4.

{¶ 22} The case was retried in August 2008, and the defense presented testimony from M.Q., an eight-year-old boy, who stated that he saw D.T. put the baby in the microwave oven and turn it on. *Id.* at ¶ 5. The trial court precluded the defense from calling two additional witnesses who would testify that D.T. had told them that he placed the baby in the microwave. *Id.*

{¶ 23} At the conclusion of the evidence, the jury found Arnold guilty, but deadlocked during the sentencing phase. *Id.* at ¶ 8. The trial court then sentenced Arnold to life in prison without the possibility of parole. *Id.* In addition, the court denied Arnold's motion for new trial. *Id.* at ¶ 7.

{¶ 24} We reversed Arnold's conviction in November 2010, based on prosecutorial

misconduct and error in excluding the testimony of a witness. *Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, at ¶ 70-98. In December 2010, we also denied the State's motion for reconsideration. *State v. Arnold*, 2d Dist. Montgomery No. 23155, 2010-Ohio-6617.

{¶ 25} On remand, the case was tried for a third time in April and May 2011. At trial, the State presented evidence as follows. On the evening of August 29, 2005, Terrell Talley's sister, Leonda, offered to babysit Paris while Talley and Arnold went out. Talley and Arnold left about 6:30 or 7:00 p.m., purchased a bottle of Bicardi 151, and went to a park. They sat in the park and drank almost all the bottle, taking turns. While at the park, they argued about whether Paris was Talley's baby, because Talley had heard that Arnold had been cheating on him. After about two hours, they came home. Arnold was driving crazy, going way beyond the speed limit. When they arrived back home between 9:00 and 10:00 p.m, they got in a physical altercation in the parking lot, during which, according to Talley, Arnold bit his lip, and he slapped her in the face. Witnesses described Arnold as very intoxicated and barely able to walk and talk.

{¶ 26} When Talley and Arnold came back, Talley's sister, Leonda, took her children home and put them to bed. In the meantime, Talley went with the next-door neighbor, Jason Stroufe, to a nearby apartment called the "bootleg" to buy some beer. Talley and Stroufe then came back and drank the beer on Stroufe's porch. When Leonda came back outside, she saw Arnold attempting to drive away in the car. Leonda told Arnold that she was too drunk to drive, and took Arnold to get cigarettes. On the way back, Arnold asked Leonda to stop the car because she thought she was going to vomit. They returned about 40 minutes after they left, and Arnold went into her own house.

{¶ 27} Subsequently, Talley went to an apartment called the "Spot," where he and

another individual normally sold drugs. Talley stayed at the Spot until 5:30 or 6:00 a.m., when he returned to Arnold's apartment.

{¶ 28}    The State presented evidence that Paris was alive and fine at various intervals – during the time that Leonda babysat, and after Talley and Arnold came home from the cigarette run. Both Leonda and Marcellena Perry testified that Leonda checked on Paris and China at approximately 11:45 p.m., at Talley's request. According to Leonda and Perry, Arnold was asleep on the couch and the baby was in a car seat next to another couch. After checking on Paris, Leonda locked the house and took the house key to Talley at the Spot. According to Leonda, Paris was sleeping and she did not see any injuries. Nothing was wrong with Paris at that time – which was around midnight.

{¶ 29}    As was indicated, Arnold told the police that she last saw Paris alive around 2:30 a.m., when Paris woke her. Again, Arnold claimed that she had fed Paris, had changed the baby's diaper, and had gone back to sleep. At trial, the State presented evidence that the time of death was between 1:00 and 3:15 a.m.; that Arnold was seen outside on her porch at around 4:00 a.m.; that Paris's DNA had been found in the microwave oven; and that Paris's DNA was the source of a translucent material or suspected skin found in the plastic tub. In addition, the State presented evidence from two women who were housed with Arnold in jail. During an altercation in which one of the inmates called Arnold a "baby killer," Arnold stated that "I didn't mean to do it." Transcript of April and May 2011 Proceedings, Volume XIII, pp. 3787 and 3803.

{¶ 30}    The defense challenged the timelines presented, and also challenged the testimony that the apartment was locked, with no one having access other than Arnold after 11:45 p.m. In addition, the defense presented evidence establishing that Talley, in fact, was Paris's

father, and that he was a jealous and violent individual.

{¶ 31} After hearing the evidence, the jury convicted Arnold on the Aggravated Murder charge and specification. Following the trial on the guilt phase, the court allowed the defense and State to proffer testimony and exhibits regarding the alleged third-party guilt of Arnold's nephew, D.T. Subsequently, the jury heard evidence pertaining to the potential penalty, and unanimously recommended that Arnold be sentenced to life in prison without parole. The trial court then sentenced Arnold as the jury had recommended. Arnold appeals from her conviction and sentence.

## II. Did the Trial Court Err in Overruling
## Arnold's Motion to Dismiss the Death Penalty Specification?

{¶ 32} Arnold's First Assignment of Error is as follows:

The Trial Court Erred in Overruling Defendant's Motion to Dismiss the Death Penalty Specification[,] a Violation of Her Fifth Amendment Right Against Double Jeopardy.

{¶ 33} Under this assignment of error, Arnold contends that the trial court should have dismissed the death penalty specification on double jeopardy grounds after the jury at her prior trial failed to unanimously impose the death penalty. In this regard, Arnold notes that Ohio has only two alternatives for deciding the issue of death – a unanimous finding for death, or imposition of some type of life sentence. As a result, the jury's failure to unanimously conclude either that the aggravating circumstances outweighed the mitigating circumstances or which of three life sentences would be recommended was a finding that the State failed to meet its burden.

According to Arnold, this was an acquittal precluding the State from subjecting her to retrial on the death penalty.

{¶ 34} The parties do not factually dispute what occurred at Arnold's prior trial during the penalty phase. Before deliberating on the potential sentence, the jury was instructed as follows:

"If all 12 of you find that the State of Ohio proved beyond are [sic] reasonable doubt that the aggravating circumstance the defendant was guilty of committing is sufficient to outweigh the mitigating factors in this case, then it would be your duty to decide that the sentence of death would be imposed upon the defendant, China Arnold. If you find that the State of Ohio has failed to prove beyond a reasonable doubt that the aggravating circumstance Defendant China Arnold was guilty of committing is sufficient to outweigh the mitigating factors present in this case, then it will be your duty to decide which of the following life-sentence alternatives should be imposed. * * * [I]f the weight of the aggravating circumstance and mitigating factors are equal, then you must proceed to consider the life-sentence alternatives. You are not required to unanimously find that the State failed to prove that the aggravating circumstance outweighs the mitigating factors before considering one of the life-sentence alternatives. You should proceed to consider and choose one fo [sic] the life-sentence alternatives if any one or more of you conclude that the State has failed to prove beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating factors. One juror may prevent a death-penalty determination by finding that the

aggravating circumstance does not outweigh the mitigating factors. You must be unanimous on one of the life-sentence alternatives. * * * [I]f you cannot unanimously agree on a specific life sentence, you will then inform the Court by written note that you are unable to render a sentencing verdict." (Ellipses in original.) Reply to State's Memorandum Regarding Application of Double Jeopardy and Death Penalty, Doc. #27, p. 4, quoting from Transcript of Proceedings of August 2008 Trial, Volume XII, pp. 2690-94.

{¶ 35} After the jury in the prior trial had deliberated for several hours, the jury sent the court a note, stating that "We are unable to render a sentencing verdict." State's Reply to Defendant's Memorandum Concerning This Still Being a Death Penalty Case on Remand, Doc. #28, p. 2, quoting Court's Exhibit XVIII, and Transcript of Proceedings of August 2008 Trial, p. 2703. After being given a modified charge pursuant to *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989), and deliberating for another hour, the jury sent the judge a second note stating, "We find it impossible to reach a sentencing verdict." *Id.*, quoting Court's Exhibit XIX and Transcript of Proceedings of August 2008 Trial, p. 2717.

{¶ 36} When the jury was brought into the courtroom, the trial court asked if the jury could possibly reach agreement as to a sentencing verdict after an additional period of time, either that day or the following day. At this point, the jury foreman answered "No." *Id.*, quoting from p. 2720. The trial court then declared the jury hung and dismissed the jury. *Id.* Subsequently, the trial court imposed a sentence of life imprisonment without parole.

{¶ 37} After Arnold appealed from the judgment in the second trial, we reversed the conviction and sentence, based on prosecutorial misconduct and error in excluding testimony of a

witness.  *Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, ¶ 70-98.  On remand, Arnold was again subjected to death penalty specifications.  Before the third trial, the parties addressed the issue of whether the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution prohibited imposition of the death penalty.  After receiving memoranda from the parties, the trial court held that double jeopardy had not attached, and that Arnold could be retried with the death penalty specification.  See Decision, Order and Entry Finding that Jeopardy Has Not Attached and Defendant May Be Tried with Death Penalty Specification on Remand, Doc.# 31.

**{¶ 38}**    In particular, the trial court concluded that the jury had not acquitted Arnold of the death penalty specifications, because the jury was simply unable to reach a verdict.  *Id*. at p. 6.  The court also noted that the jury did not make any findings regarding Arnold's legal entitlement to a life sentence.  *Id*.  Arnold acknowledges this, but argues that the only conclusion that could have been reached, given the instructions to the jury, is that the State failed to meet its burden on the death penalty.

**{¶ 39}**    The Supreme Court of Ohio has noted that " '[t]he constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal.' "  *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 139, quoting *Arizona v. Washington,* 434 U.S. 497, 503, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978).  "On the other hand, the Double Jeopardy Clause ordinarily does not prohibit the imposition of an increased sentence on remand from appeal."  *Id.*, citing *United States v. DiFrancesco*, 449 U.S. 117, 138-139, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980).

**{¶ 40}**    In a number of cases, the United States Supreme Court has addressed the issue of

death penalty specifications and double jeopardy. In *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the jury had returned a verdict rejecting the death penalty and fixing the defendant's punishment at life imprisonment without parole eligibility for 50 years. *Id.* at 435-436. This was done following separate deliberations on the death penalty. Subsequently, the trial judge granted the defendant's motion for a new trial on grounds relating to statutory deficiencies in jury selection. *Id.* at 436. When the trial court refused to let the State seek the death penalty on retrial, the State sought a writ of prohibition or mandamus from the court of appeals. *Id.* at 436-437. Ultimately, after the Supreme Court of Missouri granted a writ of prohibition, the case was accepted for review by the United States Supreme Court. *Id.* at 437.

{¶ 41} The United States Supreme Court first noted that it had resisted attempts to extend double jeopardy principles to sentencing, because "imposition of a particular sentence usually is not regarded as an 'acquittal' of any more severe sentence that could have been imposed." (Citations omitted.) *Id*. at 438. However, the Court distinguished these cases from the death penalty sentencing process, which requires a separate hearing and standards to guide the jury, and also imposes a burden on the State to establish "certain facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts." *Id.* The Court concluded that "[t]he presentence hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment so precisely defined by the Missouri statutes." (Footnote omitted.) *Id.*

{¶ 42} In this regard, the Supreme Court stressed that:

These procedural differences become important when the underlying rationale of the cases is considered. The State here relies principally upon *North*

*Carolina v. Pearce*. The Court's starting point in that case, 395 U.S., at 719-720, 89 S.Ct., at 2077-2078, was the established rule that there is no double jeopardy bar to retrying a defendant who has succeeded in overturning his conviction. The Court stated that this rule rests on the premise that the original conviction has been nullified and "the slate wiped clean." 395 U.S., at 721, 89 S.Ct., at 2078. Therefore, if the defendant is convicted again, he constitutionally may be subjected to whatever punishment is lawful, subject only to the limitation that he receive credit for time served. (Footnote and citations omitted.) *Bullington*, 451 U.S. at 442, 101 S.Ct. 1852, 68 L.Ed.2d 270.

{¶ 43} After recognizing this general principle, the United States Supreme Court relied on an exception it found pertinent – that "[a] defendant may not be retried if he obtains a reversal of his conviction on the ground that the evidence was insufficient to convict." *Id.*, citing *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). In this context, the Court stressed that:

"[R]eversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its cases. As such, it implies nothing with respect to the guilt or innocence of the defendant. . . .

"The same cannot be said when a defendant's conviction has been overturned due to a failure of proof at trial, in which case the prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it can assemble. . . . Since we necessarily accord absolute finality to a jury's

*verdict* of acquittal – no matter how erroneous its decision – it is difficult to conceive how society has any greater interest in retrying a defendant when, on review, it is decided as a matter of law that the jury could not properly have returned a verdict of guilty." (Emphasis sic.) *Bullington* at 442-443, quoting *Burks* at 15-16.

{¶ 44} The Court observed that in the usual sentencing procedure, it would be impossible to tell if the government's failure to prove its case resulted in imposition of less than the statutory maximum. *Id.* at 443-444. In contrast, "[b]y enacting a capital sentencing procedure that resembles a trial on the issue of guilt or innocence, however, Missouri explicitly requires the jury to determine whether the prosecution has 'proved its case.' " *Id.* at 445. Thus, the exception to the general rule in *Pearce* would apply, and the life imprisonment sentence the defendant had received at his first sentencing hearing meant that he had been acquitted of whatever was needed to impose the death penalty. *Id.*

{¶ 45} Subsequently, in *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), the Supreme Court of the United States extended *Bullington's* double jeopardy holding to a capital sentencing proceeding in which a judge made the sentencing decision. The court reasoned that both statutory proceedings shared the same characteristics. *Id.* at 209-211.

{¶ 46} In a more recent case, the United States Supreme Court considered whether "double-jeopardy protections were triggered when the jury deadlocked at [the defendant's] first sentencing proceeding and the court prescribed a sentence of life imprisonment pursuant to Pennsylvania law." *Sattazahn v. Pennsylvania*, 537 U.S. 101, 109, 123 S.Ct. 732, 154 L.Ed.2d

588 (2003).   In this context, the Court concluded that:

> Under the *Bullington* line of cases * * *, the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an "acquittal."   Petitioner here cannot establish that the jury or the court "acquitted" him during his first capital-sentencing proceeding.   As to the jury: The verdict form returned by the foreman stated that the jury deadlocked 9-to-3 on whether to impose the death penalty; it made no findings with respect to the alleged aggravating circumstance.   That result – or more appropriately, that non-result – cannot fairly be called an acquittal "based on findings sufficient to establish legal entitlement to the life sentence."   *Id*., quoting *Rumsey* at 211.

{¶ 47}   In this regard, the majority opinion noted that:

> It could be argued, perhaps, that the statutorily required entry of a life sentence creates an "entitlement" even without an "acquittal," because that is what the Pennsylvania Legislature intended – i.e., it intended that the life sentence should survive vacation of the underlying conviction.   The Pennsylvania Supreme Court, however, did not find such intent in the statute – and there was eminently good cause not to do so.   A State's simple interest in closure might make it willing to accept the default penalty of life imprisonment when the conviction is affirmed and the case is, except for that issue, at an end – but unwilling to do so when the case must be retried anyway.   And its interest in conservation of resources might make it willing to leave the sentencing issue unresolved (and the default life sentence in place) where the cost of resolving it is the empaneling of a new jury

and, in all likelihood, a repetition of much of the guilt phase of the first trial – though it is eager to attend to that unfinished business if there is to be a new jury and a new trial anyway. *Sattazahn* at 110.

**{¶ 48}** Arnold has attempted to distinguish *Sattazahn*, based on differences between R.C. 2929.03(D)(2) and Pennsylvania's statutory scheme. For example, Arnold stresses that the Pennsylvania scheme requires a unanimous verdict either for the death penalty or for life imprisonment. Furthermore, in the Pennsylvania statute, the jury must make multiple factual decisions, by first determining whether the aggravating circumstance has been proven beyond a reasonable doubt, and if so, whether the mitigating factors outweigh the aggravating factors. In contrast, Ohio requires only one factual decision at the penalty stage, i.e., whether the State has proven beyond a reasonable doubt that the aggravating factors of which the offender has been found guilty outweigh the mitigating factors.

**{¶ 49}** The issue of whether double jeopardy attaches is a close one. *Sattazahn* was a five to four decision, and the dissent noted that "the question is genuinely debatable, with tenable argument supporting each side." *Sattazahn*, 537 U.S. at 119, 123 S.Ct. 732, 154 L.Ed.2d 588 (Ginsburg, J., dissenting). In discussing the issue, the dissent noted while acquittal is the standard method of securing a judgment in a defendant's favor, a body of law had also developed " 'guarding the separate but related interest of a defendant in avoiding multiple prosecutions even where no final determination of guilt or innocence has been made.' " *Id*. at 120, quoting *United States v. Scott*, 437 U.S. 82, 92, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978). This body of law involves two categories: (1) mistrials; and (2) instances where trial terminates in favor of the defendant prior to any decision on " 'factual guilt or innocence.' " *Id*., quoting *Scott* at 94.

**{¶ 50}** According to the dissent, Sattazahn's case fell into the latter category, because no mistrial was declared after the jury deadlocked; instead, under Pennsylvania law, the proceedings terminated in the defendant's favor, " 'then and there.' The government could not simply retry the sentencing issue at will. The hung jury in Sattazahn's case did not 'mak[e] . . . completion' of the first proceeding 'impossible,' *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949); instead, Pennsylvania law required the judge to bring that proceeding to a conclusion by entering a final judgment imposing a life sentence* * *." (Citation omitted.) *Sattazahn* at 122.

**{¶ 51}** The dissent stressed that the defendant in *Scott*, unlike Sattazahn, voluntarily chose to abort the trial proceedings on a basis unrelated to his factual guilt or innocence. *Id.* at 125. In deciding that double jeopardy should apply, Justice Ginsburg stated that:

> I recognize that this is a novel and close question: Sattazahn was not "acquitted" of the death penalty, but his case was fully tried and the court, on its own motion, entered a final judgment – a life sentence – terminating the trial proceedings. I would decide the double jeopardy issue in Sattazahn's favor, for the reasons herein stated, and giving weight to two ultimate considerations. First, the Court's holding confronts defendants with a perilous choice, one we have previously declined to impose in other circumstances. Under the Court's decision, if a defendant sentenced to life after a jury deadlock chooses to appeal her underlying conviction, she faces the possibility of death if she is successful on appeal but convicted on retrial. If, on the other hand, the defendant loses her appeal, or chooses to forgo an appeal, the final judgment for life stands. In other words, a defendant in Sattazahn's position must relinquish either her right to file a

potentially meritorious appeal, or her state-granted entitlement to avoid the death penalty.

We have previously declined to interpret the Double Jeopardy Clause in a manner that puts defendants in this bind. In *Green* [*v. United States*, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)], we rejected the argument that appealing a second-degree murder conviction prolonged jeopardy on a related first-degree murder charge. We noted that a ruling on this question in favor of the prosecutor would require defendants to "barter [their] constitutional protection against a second prosecution for an offense punishable by death as the price of a successful appeal from an erroneous conviction of another offense." *Id.*, at 193, 78 S.Ct. 221. "The law," we concluded, "should not . . . place [defendants] in such an incredible dilemma." Although Sattazahn was required to barter a state-law entitlement to life against his right to appeal, rather than a constitutional protection, I nevertheless believe the considerations advanced in *Green* should inform our decision here.

Second, the punishment Sattazahn again faced on retrial was death, a penalty "unique in both its severity and its finality." *Monge v. California*, 524 U.S. 721, 732, 118 S.Ct. 2246, 141 L.Ed.2d 615 (1998) (internal quotation marks omitted). These qualities heighten Sattazahn's double jeopardy interest in avoiding a second prosecution. The "hazards of [a second] trial and possible conviction," *Green*, 355 U.S., at 187, 78 S.Ct. 221, the "continuing state of anxiety and insecurity" to which retrial subjects a defendant, and the "financial" as well as

the "emotional burden" of a second trial, [*Arizona v*.] *Washington*, 434 U.S. [497], at 503-504, 98 S.Ct. 824 [1978], are all exacerbated when the subsequent proceeding may terminate in death. Death, moreover, makes the "dilemma" a defendant faces when she decides whether to appeal all the more "incredible." *Green*, 355 U.S., at 193, 78 S.Ct. 221. As our elaboration in *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), and later cases demonstrates, death is indeed a penalty "different" from all others. (Citations omitted.) *Sattazahn*, 537 U.S. at 126-128, 123 S.Ct. 732, 154 L.Ed.2d 588.

{¶ 52} As was noted, the decision in Sattazahn was close, and the majority disagreed with Justice Ginsburg's position. The Supreme Court of Ohio has subsequently expressed its agreement with the majority position. In *Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, the jury had recommended the death penalty, but the trial judge declared a mistrial and imposed life imprisonment, based on error in admission of exhibits in the sentencing phase. *Id*. at ¶ 29. After the State appealed, the court of appeals reversed the trial judge and remanded the case. On remand, the trial judge imposed the death penalty after finding that the aggravating circumstances outweighed the mitigating factors. *Id*. at ¶ 30-31. On further appeal, the Supreme Court of Ohio concluded that no reversible error had occurred during the penalty phase. However, the court also concluded that the jury's verdict had been invalidated by submission of the exhibits. The court, therefore, vacated the death penalty and remanded the case for re-sentencing. *Id*. at ¶ 32.

{¶ 53} Although the Supreme Court of Ohio agreed with the defendant that the trial

court did not abuse its discretion in excluding the exhibits, the court did not agree that the Double Jeopardy Clause would prohibit a newly-empaneled jury from considering the death penalty on remand. *Id*. at ¶ 131-133 and 136-152. The court first noted that the decision to grant life imprisonment was not based on a conclusion that the State failed to prove its case; instead it resulted from a procedural error. *Id.* at ¶ 147. In addition, the court rejected the defendant's reliance on the dissenting opinion in *Sattazahn*. The court stressed that:

> Our decision, however, is governed by the majority opinion in *Sattazahn*, which states: "Under the *Bullington* line of cases * * *, the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.' " 537 U.S. at 109, 123 S.Ct. 732, 154 L.Ed.2d 588. We have already concluded that there has been no "acquittal" of the death penalty in this case. That ends the analysis. Hancock's fifth proposition of law is overruled. *Hancock* at ¶ 152.

{¶ 54} *Hancock* differs factually from the present case, in that it involves declaration of a mistrial after a jury had recommended the death penalty. The other case in which the Supreme Court of Ohio has considered *Sattazahn* is *State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534. Like *Hancock*, *White* involved a defendant who had been sentenced to death, but the sentence had been overturned, this time by a federal habeas decision, requiring resentencing of the defendant. *Id*. at ¶ 1.

{¶ 55} The issue in *White* was whether the trial court could retroactively apply R.C. 2929.06(B), which "requires the trial court, when resentencing a capital offender who was tried by a jury and whose death sentence has been set aside, to empanel a new jury and conduct a fresh

penalty hearing, at which death may be a penalty to be considered by the jury." *Id*. at ¶ 2. After reviewing the history of the statute, the Supreme Court of Ohio concluded that R.C. 2929.06 was remedial and could be applied retroactively to defendants who committed aggravated murder prior to the statute's enactment. *Id*. at ¶ 26-48.

{¶ 56} In *White*, the Supreme Court of Ohio also addressed a double jeopardy argument raised by the Ohio Academy of Criminal Defense Lawyers ("OACDL"). The OACDL argued that the former version of R.C. 2929.06 had " 'created an irrebuttable presumption that the first jury, in the absence of the biased juror, would not have recommended death and therefore a life sentence must be imposed.' " *Id*. at ¶ 65. According to OACDL, this would be " 'the equivalent of an acquittal of the death penalty that precludes reinstatement of that punishment.' " *Id*.

{¶ 57} As in *Hancock*, the Supreme Court of Ohio stressed that " '[o]nly a finding that the state has failed to prove its case for death constitutes an "acquittal of the death penalty" for double-jeopardy purposes.' " *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 67, quoting *Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, at ¶ 150. Citing *Sattazahn*, the court further emphasized that "a life sentence imposed by a judge solely because the jury has deadlocked, and thus failed to make any findings at all, is not an acquittal of the death sentence for double-jeopardy purposes." *Id*. at ¶ 68, citing *Sattazahn*, 537 U.S. at 109-110, 123 S.Ct. 732, 154 L.Ed.2d 588.

{¶ 58} Neither *Hancock* nor *White* involves the same procedural situation as the case before us. However, the Supreme Court of Ohio has clearly expressed the opinion that a deadlocked jury is not an "acquittal" for purposes of the death penalty, and that opinion is binding.

{¶ 59} We also disagree with Arnold's position that distinctions between the statute

involved in *Sattazahn* and R.C. 2929.03(D)(2) indicate that an acquittal occurred when the jury deadlocked. The statute involved in *Sattazahn* states, with respect to the capital penalty proceedings, that " 'the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance . . . and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.' " *Sattazahn* at 104, quoting 42 Pa. Stat.Ann. 9711(c)(iv) (Purdon Supp.2002). Furthermore, if the trial judge concludes that further deliberation will not result in a unanimous verdict, the judge may discharge the jury, and is required to enter a sentence of life imprisonment. *Id.,* citing 9711(c)(v).

{¶ 60} We see no meaningful distinction between this statute and R.C. 2929.03(D)(2), which provides that "the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender."

{¶ 61} R.C. 2929.03(D)(2) additionally states that if the jury fails to make such a finding, the jury shall recommend one of three alternate life-imprisonment sentences. In situations where a jury is "irreconcilably deadlocked during its sentencing deliberations in the penalty phase of a capital murder trial and is unable to reach a unanimous verdict to recommend any sentence authorized" by the statute, the trial court is required to sentence the offender to one of the specified terms of life imprisonment. *State v. Springer,* 63 Ohio St.3d 167, 586 N.E.2d 96

(1992), syllabus.

**{¶ 62}** We also note that the jury in *Sattazahn* actually returned a form indicating that it was deadlocked 9-3 in favor of life imprisonment. *Sattazahn*, 537 U.S. at 104, 123 S.Ct. 732, 154 L.Ed.2d 588. Although this is a specific finding and indicates that the jury could not have unanimously made either finding that justified the death penalty, the majority of the justices did not find this compelling. One could argue that in *Sattazahn*, as well as in the case before us, the defendant was implicitly acquitted of the death penalty. However, that is not sufficient under present jurisprudence. Accordingly, the trial court did not err in refusing to grant Arnold's motion to dismiss the death penalty specification.

**{¶ 63}** The State also argues that the alleged error would have been harmless. Arnold's response is that such an error in a death-penalty case can never be harmless, due to the gravity of issues involved. In view of our resolution of the assignment of error, we need not consider this matter.

**{¶ 64}** Arnold's First Assignment of Error is overruled.

### III. Did the Trial Court Err in Failing to Instruct the Jury on the Lesser Included Offense of Reckless Homicide?

**{¶ 65}** Arnold's Second Assignment of Error states that:

The Trial Court Erred in Not Instructing the Jury on the Lesser Included Offense of Reckless Homicide.

**{¶ 66}** Under this assignment of error, Arnold contends that the trial court should have instructed the jury on the lesser included offense of Reckless Homicide. According to Arnold,

the facts support two separate theories of mistake-in-fact: (1) that in the fog of the 2:00 a.m. feeding, Arnold placed the child instead of milk in the microwave oven; and (2) that there was a mistake-of-fact regarding the functioning of the microwave oven.

{¶ 67} At trial, the defense requested an instruction on Reckless Homicide. The trial court refused to give the instruction, concluding that the facts were not consistent with recklessness. The court noted that:

In support of defendant's request for instruction of reckless homicide, the Defense articulated a theory of defense that, one, defendant was present at the time of death; two, defendant stated, as introduced into evidence by the State's witnesses Ashley Shock and Jeanyne Bradley (phonetic), the defendant did not mean to do it; three defendant was highly intoxicated; and four, the defendant did not commit the act purposely. Transcript of April and May 2011 Proceedings, Volume XVI, p. 4513.

{¶ 68} After a detailed discussion, the trial court concluded that the facts of the case were not consistent with recklessness. *Id*. at pp. 4514-4519. Among other things, the court pointed to the lack of circumstances indicating that the child could have placed herself in the microwave oven; the child's marked lack of resemblance to any objects that would typically be placed in an oven; the fact that someone had to manually open and close the door and punch in the time period of operation; the fact that the child died in the oven or shortly thereafter; the change of clothing that occurred after the burn, typified by the lack of skin or seepage on the nightgown; Arnold's statement that she fed the baby and changed her diaper at about 2:30 a.m.; the fact that Arnold was seen outside her apartment at 4:00 a.m., and the fact that Talley found the baby cold,

stiff, and burned, at about 6:45 or 7:00 a.m.   *Id.* at pp. 4514-4516.

{¶ 69}   In addition, the trial court concluded that the defense theory of recklessness depended upon the factual predicate that Arnold was intoxicated, which is an impermissible predicate under R.C. 2901.21(C).   *Id*. at p. 4519.

{¶ 70}   In response to the court's comments, the defense noted that it was not trying to argue voluntary intoxication, but rather that there could have been an honest mistake of fact, where someone could become confused, due to a stupor state, as to what to heat up in the microwave oven.   *Id.* at pp. 4521-4522.   The court rejected this theory, based on the lack of evidence in the record of a blackout scenario.   *Id*. at p. 4523.

{¶ 71}   The Supreme Court of Ohio noted in *State v. Wolons*, 44 Ohio St.3d 64, 541 N.E.2d 443 (1989), that decisions to refuse a particular instruction are reviewed by a standard of whether the refusal "was an abuse of discretion under the facts and circumstances of the case." *Id*. at 68.   *Accord State v. Collier*, 2d Dist. Montgomery No. 20131, 2005-Ohio-119, ¶ 25.

{¶ 72}   " 'Abuse of discretion' has been described as including a ruling that lacks a 'sound reasoning process.' "   *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp*., 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).   "A review under the abuse-of-discretion standard is a deferential review.   It is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments."   *Id*.

{¶ 73}   After reviewing the record, we find no abuse of discretion in the trial court's

rejection of a Reckless Homicide instruction. Reckless homicide is a lesser included offense of the crime of Aggravated Murder. *State v. Teets*, 4th Dist. Pickaway No. 02CA1, 2002-Ohio-6799, ¶ 32. It differs from the crime charged in this case, R.C. 2903.01(C) (Aggravated Murder), with respect to the mental state required. Specifically, R.C. 2903.041(A) (Reckless Homicide) provides that "No person shall recklessly cause the death of another or the unlawful termination of another's pregnancy." In contrast, R.C. 2903.01(C) states that "No person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense."

{¶ 74} The two states of mind are defined in R.C. 2901.22. With respect to "recklessly," R.C. 2901.22(C) provides that:

A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.

{¶ 75} "Purposely" is defined as follows by R.C. 2901.22(A):

A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

{¶ 76} In *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, the

Supreme Court of Ohio outlined rules for evaluating jury instructions. In this regard, the court noted that:

> Even though an offense may be a lesser included offense, a charge on the lesser offense is required "only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. The trial court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense. The lesser-included-offense instruction is not warranted every time "some evidence" is presented to support the lesser offense. *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272. Rather, a court must find "sufficient evidence" to "allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense." (Emphasis sic.) *Id*. at 632-633, 590 N.E.2d 272. (Citation omitted.) *Trimble* at ¶ 192.

{¶ 77} The first defense theory is that the baby was mistakenly placed in a microwave oven instead of a bottle. "Generally, mistake of fact is a defense if it negates a mental state required to establish an element of a crime, except that if the defendant would be guilty of a crime under facts as he believed them, then he may be convicted of that offense." *State v. Cooper*, 10th Dist. Franklin No. 09AP-511, 2009-Ohio-6275, ¶ 9, citing *State v. Pecora*, 87 Ohio App.3d 687, 690, 622 N.E.2d 1142 (9th Dist.1993). "Mistake of fact is widely recognized as a defense to specific intent crimes such as theft since, when the defendant has an honest purpose, such a

purpose provides an excuse for an act that would otherwise be deemed criminal." *Id.*, citing *Farrell v. State*, 32 Ohio St. 456 (1877).

{¶ 78} Arnold's asserted "mistake of fact" is, frankly, unbelievable. There is simply no way, "stupor" or not, that a seven-pound baby could be mistaken for a baby bottle, either in size, weight, or shape. Furthermore, as the trial court noted, allowing this to be asserted would have violated the established rule that voluntary intoxication is not a defense to any crime in Ohio. *See, e.g.*, *State v. Krueger*, 8th Dist. Cuyahoga No. 93742, 2010-Ohio-3725, ¶ 23, citing *State v. Fox*, 68 Ohio St.2d 53, 428 N.E.2d 410 (1981). *See, also*, R.C. 2901.21(C) (stating that "[v]oluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense.").

{¶ 79} We also note that Arnold's own statements about the fact that she heated a bottle, fed the baby, and changed the baby's diaper at around 2:30 a.m. negate any such alleged "stupor."

{¶ 80} The second defense theory mentioned in Arnold's brief is that Arnold made a mistake regarding the functioning of the microwave oven. In this regard, the theory appears to be that Arnold placed the baby in the microwave oven, not realizing that the oven was an "energy" source rather than a heat source. Under this theory, Arnold apparently intended to place the baby in the oven for a few moments, not realizing that the energy would heat the baby's temperature to a point that it would kill her. Again, this theory does more than strain credulity.

{¶ 81} Under the circumstances, we find no abuse of discretion in the trial court's refusal to instruct the jury on the lesser included offense of Reckless Homicide.

{¶ 82} Arnold's Second Assignment of Error is overruled.

## IV. Did the State's Use of a Peremptory Challenge
## Deny Arnold Equal Protection Under the Law?

{¶ 83}   Arnold's Third Assignment of Error states that:

The Trial Court Erred in Permitting the State to Use a Peremptory Challenge in a Racially Discriminatory Fashion[,] Thereby Denying Appellant Equal Protection Under the Law as Guaranteed By the United States and Ohio Constitutions.

{¶ 84}   Under this assignment of error, Arnold contends that the trial court erred in overruling a defense objection to the State's use of its second peremptory challenge.   Specifically, the State used its challenge to strike a female African-American juror, Ms. F.

{¶ 85}   In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stressed that "[t]he Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, * * * or on the false assumption that members of his race as a group are not qualified to serve as jurors." (Citations omitted.) *Id*. at 86.  "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure.   'The very idea of a jury is a body . . . composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds.' " *Id*. at 86-87, quoting *Strauder v. West Virginia*, 10 Otto 303, 100 U.S. 303, 308, 25 L.Ed. 664 (1880).   (Other citation omitted.)

**{¶ 86}** *Batson* created the following three-part test for deciding if a prosecutor's use of a peremptory challenge is racially motivated:

> First, the opponent of the strike must make a prima facie showing of discrimination. Second, the proponent must give a race-neutral explanation for the challenge. Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful racial discrimination. *State v. White*, 85 Ohio St.3d 433, 436, 709 N.E.2d 140 (1999), citing *Batson* at 96–98. (Other citations omitted.)

**{¶ 87}** "In order to establish a prima facie case of discrimination, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race." *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 48, citing *Batson* at 95 and *State v. Williams*, 10th Dist. Franklin No. 03AP-24, 2003-Ohio-5761. "The trial court must 'consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present.' " *Id.*, quoting *Batson* at 96-97.

**{¶ 88}** In the case before us, the trial court skipped the first stage and moved directly to the second stage, in which "the burden shifts to the prosecutor to articulate a race-neutral explanation for the peremptory challenge 'related to the particular case to be tried.' " *Id.* at ¶ 49, quoting *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69. "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause * * *." (Citations omitted.)

*Batson* at 97.

**{¶ 89}** Furthermore, "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). "A neutral explanation * * * means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

**{¶ 90}** When the trial court asked the prosecutor for an explanation of the peremptory challenge of Ms. F., the prosecutor stated as follows:

Judge, I would note from my notes regarding the death qualification voir dire on Ms. [F.]. She indicated she was not for the death penalty, personally. In her written questionnaire on Question 45, she indicated that she felt that government killing is still violence and it was not right. Although she wavered a little bit towards the end when rehabilitated, she said it would be difficult to sign a death verdict. Ultimately, it got to the point where she said she could probably do it.

And I would also cite to the Court the case of *State v. Were* – that's W-E-R-E. It's 118 Ohio St.3d 448.

* * *

* * * It's 118 Ohio St.3d 448 as well as *State v. White*, 85 Ohio St. 3d 433. Those are both Ohio Supreme Court cases dealing with the death penalty in which

the Supreme Court of Ohio found that the jurors['] equivocal answers relating to the death penalty created uncertainty about her ability to vote for the death penalty; and uncertainty as to how a prospective juror perceives the death penalty is in fact a race-neutral reason for exercising peremptory challenge; and while jurors' answers may not rise to the level of a survivable challenge for cause, both prosecutors and defense attorneys must remain free to challenge on peremptory basis when juror's [sic] answers create overall concerns on the subject at issue, that being the death penalty in this case, Your Honor.  Transcript of April and May 2011 Proceedings, Volume IX, pp. 2784-2785.

{¶ 91}    The prosecutor's explanation was race-neutral.   The Supreme Court of Ohio has held that "[u]ncertainty about how a prospective juror perceives the death penalty is a 'race-neutral reason' for exercising a peremptory challenge against her."  *State v. Were*,  118 Ohio St.3d 448, 459, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 65, citing *White*, 85 Ohio St.3d at 437, 709 N.E.2d 140.

{¶ 92}    In the third stage of the inquiry, the trial court has "the duty to determine if the defendant has established purposeful discrimination." (Footnote omitted.)  *Batson*, 476 U.S. at 98, 106 S.Ct. 1712, 90 L.Ed.2d 69.  "In making such a determination, the trial court must decide whether the prosecutor's race-neutral explanation is credible, or instead is a 'pretext' for unconstitutional discrimination."  *Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 50, citing *Hernandez*, 500 U.S. at 363, 111 S.Ct. 1859, 114 L.Ed.2d 395. (Other citation omitted.)

{¶ 93}    In *Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175, (2008),

the United States Supreme Court emphasized that:

On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility * * * and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge," *Hernandez*, 500 U.S., at 365, 111 S.Ct. 1859 (plurality opinion). In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie " 'peculiarly within a trial judge's province,' " *ibid.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)), and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]." 500 U.S., at 366, 111 S.Ct. 1859. (Citations omitted.) *Snyder* at 477-478.

**{¶ 94}** We find no exceptional circumstances in the case before us. After hearing the State and defense arguments on this point, the trial court stated as follows:

The Court's going to overrule the *Batson* challenge as to [Ms. F.] and allow the State to exercise its peremptory challenge to her, finding that the information

relayed by Ms. [F.] on her jury questionnaire with regard to the death penalty, as well as the other information provided by her in connection with the death penalty, satisfies a nonrace-related basis for the exercise of the State's peremptory. Transcript of April and May 2011 Proceedings, Volume IX, p. 2786.

{¶ 95}　During voir dire of Ms. F., the State noted that question 44 on the juror questionnaire asked whether prospective jurors had an opinion on the death penalty or an opinion opposed to the death penalty.　Ms. F. had answered that "I personally am not for the death penalty * * *."　Transcript of April and May 2011 Proceedings, Volume VII, p. 2287.　Question 45 also asked if the prospective juror had a different view on the death penalty in the past.　Ms. F. answered yes, and further stated that "I may not have mind[ed] the death penalty in the past; I have children; killing someone's child.　I am so tired of violence, government killing is still violence."　*Id.* at p. 2288.

{¶ 96}　In response to the State's question regarding whether she could recommend death and sign a verdict form recommending death, Ms. F. stated, "I probably could do it.　But it kind of would weigh on me very heavily."　*Id*. at p. 2289.　Eventually, the prosecutor elicited a statement from Ms. F. that although it would be difficult, she could set aside her qualms.　*Id.* at p. 2291.

{¶ 97}　In view of Ms. F.'s answers to the jury questionnaire, obvious difficulty with the idea of state-sponsored killing, and equivocal statements, the trial court's ruling was not clearly erroneous.　The trial court was in the best position to gauge the demeanor of Ms. F. and the prosecutor.

{¶ 98}　In arguing that the trial court erred in allowing the State to exclude Ms. F.,

Arnold argues that another juror, Mr. V., expressed views identical to Ms. F. on his questionnaire, but was not excluded. As noted by the State in its brief, Mr. V. answered in his questionnaire that the death penalty is "ok in some cases," while Ms. F. stated that she was not for the death penalty. See Court's Exhibit VIII. In addition, Mr. V. stated that he had never had a different view on the death penalty, while Ms. F. stated that she had changed her opinion, that she was tired of violence, and that "Government killing is still violence." *Id.* Thus, the answers of these jurors are not identical. We further note that during voir dire, Mr. V.'s answers did not reflect struggle with administering the death penalty, if it were warranted. *See* Transcript of April and May 2011 Proceedings, Volume VII, pp. 2283-2286.

{¶ 99} Accordingly, the trial court did not err in overruling Arnold's objection to the State's exercise of its second peremptory challenge.

{¶ 100} Arnold's Third Assignment of Error is overruled.

V. Was Arnold Prevented From Presenting a Complete Defense?

{¶ 101} Arnold's Fourth Assignment of Error states that:

The Trial Court Erred By Not Permitting Appellant to Present a Complete Defense.

{¶ 102} Under this assignment of error, Arnold contends that the trial court erred in refusing to allow her to present hearsay evidence implicating a third party, D.T., in Paris's murder. Allegedly, D.T. made statements to others admitting that he had placed Paris in the microwave oven. However, D.T. had also denied making those statements when he was interviewed by defense counsel. Prior to the presentation of evidence, the trial court filed a

decision under seal, indicating that if D.T. were called to testify, the defense would be barred by Evid.R. 607 from attempting to impeach him with the alleged statements that he had made to others. The court also stated that it would not call D.T. as a court's witness under Evid.R. 614, because that would potentially evade the policies and aims of Evid.R. 607. See, Decision and Entry Upon Defendant's Motion in Limine, filed under seal on May 2, 2011, Doc. #610, p. 5. The court also advised the parties of its decision before the presentation of evidence began. *See* Transcript of April and May 2011 Proceedings, Volume VIII, pp. 2375-2376.

{¶ 103}     Neither the State nor the defense called D.T. as a witness at trial. However, both the State and defense proffered testimony and other materials pertinent to the issue. The defense proffered the testimony of various witnesses, including T.H., Keith Boykin, Q.L., D.T., and H.W. The State proffered the testimony of Dr. Uptegrove, Daryl Smith, Gary Ware, Debra Ritchey, and Kristin Beane. In addition, the State proffered documents and other information, including letters from J.S., and J.S.'s mother, Y.H.; written statements of H.W. and his brother, A.W.; a written statement of Jeff Weaver; and dates that D.T. was either in detention or in a group home.

{¶ 104}     During the proffer, D.T. denied any involvement in Paris's murder. He also denied making any statements to others implicating himself in the murder.

{¶ 105}     T.H. testified that he had a conversation with D.T. in 2005. The conversation occurred during church, when a teacher was talking about Abraham and how Abraham was supposed to sacrifice his son, but did not do it. Since D.T. knew Arnold, T.H. asked D.T. what had really happened. In response, D.T. stated that his mother (Leonda) was cooking, grease was popping on the baby, and the baby was crying. When Leonda left the room,

D.T. put the baby in the microwave oven.

{¶ 106}     Boykin testified that in 2008, he was driving D.T. and his brother, Q.T. (also referred to in the proffer as "Q.L.") to play with Tynetta Winter's children.   During the car ride, D.T. stated that "China shouldn'ta did that to that baby."   Transcript of April and May Proceedings, Volume XVII, p. 4890.   At that point, Q.T. stated, "Unh-uh, [D.T.], you know you lying.   That baby – you know we came in that house and that baby was already dead."   *Id*. at pp. 4890-4891.   After D.T. told his brother to shut up, Q.T. said, "Unh-uh.   That baby wasn't in no seat.   His head was all between the couches and we went over there and he wasn't breathing." *Id*. at p. 4891.   Boykin subsequently informed Terrell Talley of the conversation, because Talley was his friend.   Talley stated that he knew D.T. was bad, but he did not think his nephews would do something to his baby.   Talley said he would go talk to them.

{¶ 107}     Q.T. (or Q.L.) denied making any statements about Paris's murder to Boykin.   Q.T. also said he could not remember anything about how Paris died and did not talk to anyone about it.

{¶ 108}     H.W. also testified about a conversation with D.T. at Sunday school. According to H.W., his cousins, T.H. and J.S., kept asking D.T. questions about who had killed the baby.   D.T. said that he had done it.   Then, D.T. denied doing it, but when D.T. got up to leave, D.T. again stated that he had done it.

{¶ 109}     The State proffered evidence indicating that the coroner did not find any signs of splattered grease on the baby.   However, the coroner also indicated that a substantial amount of the child's skin was missing.   In addition, both Smith, an employee of the Dayton Police Department, and Ware, an investigator with the Montgomery County Prosecutor's Office,

testified that Boykin had refused to speak with them about the case and had expressed bias against prosecutors.

{¶ 110}   Detective Debra Ritchey of the Dayton Police Department testified that she had interviewed H.W. on April 13, 2011.   At that time, H.W. told her that he did not hear D.T. say anything; that he had merely heard his cousin, T.H., talking about the case.   H.W. gave Ritchey a written statement to that effect, and said that he had told Arnold's lawyers a lie about the baby's death.

{¶ 111}   Detective Kristin Beane of the Dayton Police Department also testified and said that she had interviewed J.S., who denied knowing anything about the case.   J.S. told Beane that he had never heard D.T. say anything about the baby.

{¶ 112}   After hearing the proffers, the trial court did not make any further decisions on the matter, but simply indicated that it was permitting the parties to make a record for purposes of review in a potential appeal.   Transcript of April and May 2011 Proceedings, Volume XVIII, pp. 5063-5065.

{¶ 113}   According to Arnold, the trial court erred in refusing to admit the evidence, because there was sufficient evidence of the testimony's reliability under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), as well as corroboration of third-party guilt.

{¶ 114}   In *Chambers*, the defendant was on trial for having murdered a police officer, and was precluded, under Mississippi's "voucher" rule, from challenging the testimony of another individual who had confessed to murdering the officer and had recanted the confession. *Id*. at 287-290.   The voucher rule is a "common-law rule that a party may not impeach his own

witness. The rule rests on the presumption – without regard to the circumstances of the particular case – that a party who calls a witness 'vouches for his credibility.' " (Citation omitted.) *Id.* at 296. In describing the rule, the Court observed that:

> Although the historical origins of the "voucher" rule are uncertain, it appears to be a remnant of primative [sic] English trial practice in which "oath-takers" or "compurgators" were called to stand behind a particular party's position in any controversy. Their assertions were strictly partisan and, quite unlike witnesses in criminal trials today, their role bore little relation to the impartial ascertainment of the facts.

> Whatever validity the "voucher" rule may have once enjoyed, and apart from whatever usefulness it retains today in the civil trial process, it bears little present relationship to the realities of the criminal process. It might have been logical for the early common law to require a party to vouch for the credibility of witnesses he brought before the jury to affirm his veracity. Having selected them especially for that purpose, the party might reasonably be expected to stand firmly behind their testimony. But in modern criminal trials, defendants are rarely able to select their witnesses: they must take them where they find them. Moreover, as applied in this case, the "voucher" rule's impact was doubly harmful to Chambers' efforts to develop his defense. Not only was he precluded from cross-examining McDonald, but, as the State conceded at oral argument, he was also restricted in the scope of his direct examination by the rule's corollary requirement that the party calling the witness is bound by anything he might say. He was, therefore,

effectively prevented from exploring the circumstances of McDonald's three prior oral confessions and from challenging the renunciation of the written confession. (Footnotes omitted.)  *Id*. at 296-297.

{¶ 115}        The United States Supreme Court also noted that the voucher rule had been condemned as "archaic, irrational, and potentially destructive of the truth-gathering process," and had been "rejected altogether by the newly proposed Federal Rules of Evidence, Rule 607 * * *."  *Chambers*, 410 U.S. at 297, fn. 8 and fn. 9, 93 S.Ct. 1038, 35 L.Ed.2d 297.[1]  Accordingly, the Court concluded that the voucher rule, "as applied * * * plainly interfered with Chambers' right to defend against the State's charges."  *Id*. at 298.

{¶ 116}        The Court also observed that it did not need to decide whether this error alone required reversal.  This was because the defendant's claimed due process violation  rested on the error's ultimate impact when viewed in conjunction with the trial court's refusal to let the defendant call other witnesses who would have testified about statements the third party made implicating himself as the murderer.  These statements had been excluded as hearsay.  *Id*.

{¶ 117}        The Court remarked that "[o]ut-of-court statements are traditionally excluded because they lack the conventional indicia of reliability * * * ."  *Id*.  However, the Court also noted that "[a] number of exceptions have developed over the years to allow admission

---

[1] Fed.R.Evid. 607 was effective in 1975 and has remained essentially the same since its adoption.  The rule provides that "[a]ny party, including the party that called the witness, may attack the witness's credibility."  In contrast, Ohio's Evid.R. 607(A) is a modified version, and provides that "[t]he credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage. This exception does not apply to statements admitted pursuant to Evid. R. 801(D)(1)(a), 801(D)(2), or 803."  Ohio's rule was adopted in 1980 and has also remained essentially the same since adoption.

of hearsay statements made under circumstances that tend to assure reliability and thereby compensate for the absence of the oath and opportunity for cross-examination. Among the most prevalent of these exceptions is the one applicable to declarations against interest – an exception founded on the assumption that a person is unlikely to fabricate a statement against his own interest at the time it is made." (Footnote omitted.) *Id*. at 299.

{¶ 118} Mississippi did not recognize this exception, however. While acknowledging that federal courts had also previously excluded declarations against interest based on *Donnelly v. United States*, 228 U.S. 243, 272-273, 33 S.Ct. 449, 57 L.Ed. 820 (1913), the United States Supreme Court stressed in *Chambers* that exclusion of declarations against interest would no longer be required under the new proposed rules of evidence. (Footnote omitted.) *Chambers*, 410 U.S. at 299-300, 93 S.Ct. 1038, 35 L.Ed.2d 297. In this regard, the Court stated that:

> Exclusion, where the limitation prevails, is usually premised on the view that admission would lead to the frequent presentation of perjured testimony to the jury. It is believed that confessions of criminal activity are often motivated by extraneous considerations and, therefore, are not as inherently reliable as statements against pecuniary or properietary [sic] interest.
>
> While that rationale has been the subject of considerable scholarly criticism, we need not decide in this case whether, under other circumstances, it might serve some valid state purpose by excluding untrustworthy testimony.
>
> The hearsay statements involved in this case were originally made and subsequently offered at trial under circumstances that provided considerable

assurance of their reliability. First, each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred. Second, each one was corroborated by some other evidence in the case – McDonald's sworn confession, the testimony of an eyewitness to the shooting, the testimony that McDonald was seen with a gun immediately after the shooting, and proof of his prior ownership of a .22-caliber revolver and subsequent purchase of a new weapon. The sheer number of independent confessions provided additional corroboration for each. Third, whatever may be the parameters of the penal-interest rationale, each confession here was in a very real sense self-incriminatory and unquestionably against interest. McDonald stood to benefit nothing by disclosing his role in the shooting to any of his three friends and he must have been aware of the possibility that disclosure would lead to criminal prosecution. Indeed, after telling Turner of his involvement, he subsequently urged Turner not to "mess him up." Finally, if there was any question about the truthfulness of the extrajudicial statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury. The availability of McDonald significantly distinguishes this case from the prior Mississippi precedent, *Brown v. State*, [99 Miss. 719, 55 So. 961 (1911)], supra, and from the Donnelly-type situation, since in both cases the declarant was unavailable at the time of trial. (Citations and footnotes omitted.) *Chambers* at 299-301.

**{¶ 119}** Accordingly, the United States Supreme Court reversed the judgment and

remanded the case for further proceedings.   *Id*. at 303.

{¶ 120}        When *Chambers* was decided, Ohio had "long recognized" that "a party surprised by the adverse testimony of his witness should be permitted to cross-examine him concerning his prior inconsistent statement only for the purpose of refreshing his recollection." (Citations omitted.)   *State v. Minneker*, 27 Ohio St.2d 155, 158-159, 271 N.E.2d 821 (1971). The Supreme Court of Ohio also noted in *Minneker* that in the absence of a statute, Ohio "forbids a party from discrediting its own witness by proof of prior inconsistent statements through the testimony of another."   (Citations omitted.)   *Id.* at 159.

{¶ 121}        Evid.R. 607 became effective in Ohio in July 1980, and permitted parties to impeach their own witnesses, but only upon a showing of surprise and affirmative damage. Shortly before the rule was adopted, we discussed both *Chambers* and proposed Evid.R. 607. See *State v. Bohannon*, 2d Dist. Montgomery No. 6503, 1980 WL 352528 (April 28, 1980).

{¶ 122}        We noted in *Bohannon* that despite resounding criticism of the "voucher rule," and the existence of the *Chambers* decision, the Supreme Court of Ohio had chosen to codify the voucher rule and its exception when the court submitted proposed Rule of Evidence 607 to the General Assembly in January 1980.   *Id*. at *7.   We also stated that "[i]f there is any constitutional due process infirmity in this evidentiary rule, as was held in *Chambers v. Mississippi*, we defer to the Supreme Court of Ohio for that decision."   *Id.*

{¶ 123}        The Supreme Court of Ohio apparently has not detected a constitutional infirmity in Evid.R. 607, as more than thirty years have passed since its enactment, and the court has not, to date, directly addressed the issue.   Thus, while Fed.R.Evid. 607 contains no restrictions on attacking credibility and has operated without difficulty for more than 40 years,

Ohio has chosen a more restrictive approach. Ohio's approach is consistent with later authority of the United States Supreme Court, which stresses that:

> A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. A defendant's interest in presenting such evidence may thus " 'bow to accommodate other legitimate interests in the criminal trial process.' " *Rock [v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)], * * * (quoting *Chambers*, [410 U.S. at 295, 93 S.Ct. 1038, 35 L.Ed.2d 297]). As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock*, *supra*, at 56, 107 S.Ct., at 2711 * * * . Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. (Citations and footnote omitted.)

*U.S. v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998).

{¶ 124}     On appeal, Arnold does not directly challenge Evid.R. 607, but does so indirectly, by contending that we should focus on the due process considerations outlined in *Chambers*. We decline the invitation. Ohio has specific means for impeaching witnesses and presenting hearsay testimony that satisfy the requirements in *Chambers*. One method, as noted, is to call the witness and demonstrate surprise and damage in order to impeach the witness under Evid.R. 607. Arnold was unable to do this, because she was aware before trial of D.T.'s denial of any implicating statements. In fact, Arnold was aware of D.T.'s potential testimony at the time of

her second trial, in 2008.  *Arnold*, 189 Ohio App.3d 507, 2010-Ohio-5379, 939 N.E.2d 218, at ¶ 34.

{¶ 125}　　　　　Another method of admitting the hearsay statements of witnesses would have been pursuant to Evid.R. 804(B)(3).  The Rules of Evidence  generally make hearsay inadmissible, subject to certain exceptions.  *See* Evid.R. 802. Under Evid.R. 803, various hearsay statements can be admitted regardless of a declarant's availability, such as in cases of excited utterances of the declarant.  *See, e.g.*, Evid.R 803(2).  Evid.R. 804 outlines hearsay exceptions that apply when a declarant is not available, and defines "unavailability" to include situations where a declarant "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so."  Evid.R. 804(A)(2).  As pertinent to this case, Evid.R. 804(B) states that:

　　　　The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

　　　　* * *

　　　　(3) Statement against interest.  A statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true.  A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the truthworthiness of the statement.

(Footnote omitted.)

**{¶ 126}** Thus, if a declarant is unavailable as defined by the rule, a defendant would be able to offer hearsay statements of the declarant that are against the declarant's penal interest, subject to a demonstration of trustworthiness. As applied to the case before us, in order to admit the hearsay statements regarding D.T. that are arguably exculpatory, Arnold would have had to call D.T. as a witness and D.T. would have had to refuse to testify. A defendant is unavailable if he invokes the right against self-incrimination. *See State v. Landrum*, 53 Ohio St.3d 107, 113-114, 559 N.E.2d 710 (1990), and *State v. Issa*, 93 Ohio St.3d 49, 59, 752 N.E.2d 904 (2001). Under Rule 804(B)(3), Arnold could have called other witnesses to testify about D.T.'s out-of-court statements if D.T. refused to testify.

**{¶ 127}** Recently, the Supreme Court of Ohio considered "whether Evid.R. 804(B)(3), which requires a trial court to exclude an unavailable declarant's statement against penal interest 'unless corroborating circumstances clearly indicate the trustworthiness of the statement,' deprives a defendant of the constitutional right to present a complete defense." *State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821, ¶ 2. The court observed that "Evid.R. 804(B)(3) contains 'significant hurdles which must be overcome by the proponent of the statement' because of ' "the obvious suspicion with which the drafters of the Rule regarded a statement exposing 'the declarant to criminal liability' but exculpating the accused." ' " *Id*. at ¶ 24, quoting *State v. Sumlin*, 69 Ohio St.3d 105, 108, 630 N.E.2d 681 (1994). (Other citations omitted.)

**{¶ 128}** In considering Evid.R. 804(B)(3), the Supreme Court of Ohio stated that it found *Chambers* instructive. *Id.* at ¶ 25. Noting the indicia of trustworthiness identified in

*Chambers*, the Supreme Court of Ohio observed that Evid.R. 804(B)(3) embodies the same indicia. The court commented that " '[t]he against-interest exception was drafted with *Chambers* in mind and requires "corroborating circumstances" for statements offered to exonerate defendants, the justification being that they can be fabricated by friendly defense witnesses (and attributed to unavailable speakers) and are hard to rebut even if false.' " *Swann* at ¶ 28, quoting Mueller & Kirkpatrick, *Evidence*, Section 8.82, at 1118 (1995). The court also discussed Fed.R. 804(b)(3), which reflected the concerns in *Chambers*, and had been consistently upheld by federal courts. *Id*. at ¶ 29.

{¶ 129}         Ultimately, the Supreme Court of Ohio held that:

[T]he corroboration requirement of Evid.R. 804(B)(3) rationally serves a legitimate interest in the admission of trustworthy evidence, and therefore exclusion of a defendant's proffered evidence for lack of corroboration does not deprive a defendant of the right to present a complete defense. As we stated in *Sumlin*, 69 Ohio St.3d at 111, 630 N.E.2d 681, "Through Evid.R. 804(B)(3), Ohio has addressed one of the principal concerns of cases such as *Chambers*, which is that a criminal defendant's reliable evidence should not be excluded through application of hearsay rules that do not adequately protect due process rights. Evid.R. 804(B)(3) strikes a balance between hearsay statements against penal interest which are sufficiently trustworthy to be admissible and those which are not."

*Swann* at ¶ 30.

{¶ 130}         Because Arnold did not call D.T. as a witness, there was no opportunity for D.T. to refuse to testify and to, therefore, be considered "unavailable" for purposes of Evid.R.

804(B)(3). The trial court did assess, as a preliminary matter, the reliability of certain witnesses that might be offered in the event of D.T.'s unavailability. See Decision, Order and Entry Upon Defendant's Motion in Limine, filed under seal on May 2, 2011, Doc. #610, pp. 6-13. The trial court stated that it could not find a clear indication of trustworthiness in the testimony. *Id*. at p. 12. The court's ruling was a preliminary indication of its thoughts, but Arnold never, thereafter, presented D.T. as a witness.

{¶ 131} The State argues that even if *Chambers* did apply, the reliability requirement has not been met. In this regard, the State notes that unlike the situation in *Chambers*, D.T.'s statements were not spontaneous, but were in response to prodding, and were contradicted by the remainder of the evidence. The persons to whom D.T. made the statements were not close acquaintances, and either recanted their statements or were shown to lack credibility.

{¶ 132} The Ohio Supreme Court did apply the *Chambers* factors in *Sumlin,* 69 Ohio St.3d 105, 630 N.E.2d 681, in the context of "fundamental principles of due process," after the court had already addressed Evid.R. 804(B)(3). *Id*. at 110. However, the court subsequently indicated in *Swann* that Evid.R. 804(B)(3) and *Chambers* have the same indicia of trustworthiness. *Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821 at ¶ 28.

{¶ 133} Accordingly, there is no need to apply *Chambers* to the case before us. Even if we were inclined to do so, we would agree with the State and with the trial court's analysis. The evidence lacked reliability and was not corroborated by other evidence.

{¶ 134} Arnold's Fourth Assignment of Error is overruled.

VI.   Was Arnold Denied a Fair Trial

Due to Prosecutorial Misconduct?

{¶ 135}          Arnold's Fifth Assignment of Error states that:

Appellant was Denied the Right to Due Process And a Fair Trial, in Violation of the Fifth[,] Sixth and Fourteenth Amendments to the United States Constitution Due to a Pattern of Prosecutorial Misconduct.

{¶ 136}          Under this assignment of error, Arnold contends that she was denied a fair trial due to a pattern of prosecutorial misconduct.  In this regard, Arnold points to instances in the second closing argument where the prosecutor called Arnold and various witnesses "liars," and vouched for the credibility of State witnesses.  Arnold also argues that the State engaged in name-calling by referring to Arnold as the "Mother of the Year," referred to facts outside the record regarding a similar microwave baby case in Virginia, and engaged in personal opinion and commentary on the evidence.

{¶ 137}          The law is settled that " '[p]rosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn therefrom.' "  *State v. Ballew*, 76 Ohio St.3d 244, 255, 667 N.E.2d 369 (1996), quoting *State v. Richey*, 64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992).  (Other citation omitted.)  "The closing argument must be reviewed in its entirety to determine prejudicial error."  (Citations omitted.)  *Id*.

{¶ 138}          In *State v. Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093 (2d Dist.), we noted that:

The test for prosecutorial misconduct is whether the remarks were improper, and if so, whether they prejudicially affected the accused's substantial

rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The question is whether the prosecutor's misconduct so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 644, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). *Jeffery* at ¶ 15.

{¶ 139}     Accordingly, the first consideration is whether the remarks were improper. We have reviewed the remarks outlined by Arnold and find that the remarks were not generally improper. Furthermore, in a number of instances, Arnold failed to object, resulting in the application only of a plain error standard. Finally, in situations where the remarks were improper, they did not prevent Arnold from receiving a fair trial. In reviewing this assignment of error, we will separately address each instance of alleged misconduct, all of which occurred during the State's second closing argument.

A. Comment Characterizing Arnold as a Liar

{¶ 140}     The first alleged instance of misconduct involves the prosecutor's comment about Arnold's inability to tell the same stories. In this regard, the prosecutor stated that "You know, Mark Twain said, 'To be a good liar, you've got to have a good memory.' She [Arnold] can't even tell the same stories identical in the same day, within hours, because she's trying to figure out how do I answer this question that Dr. Matre raised, 'How did this baby get burnt like this?' " Transcript of April and May 2011 Proceedings, Volume XVI, p. 4685.

**{¶ 141}** In *State v. Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162 (2d Dist.), we noted that:

> It is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization. *State v. Stroud*, Montgomery App. No. 18713, 2002-Ohio-940, 2002 WL 242863; *State v. Gunn* (Aug. 7, 1998), Montgomery App. No. 16617, 1998 WL 453845. However, prosecutors may not invade the realm of the jury by, for example, stating their personal beliefs regarding guilt and credibility, or alluding to matters outside the record. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. *Baker* at ¶ 19.

**{¶ 142}** The State's evidence revealed a pattern of inconsistent statements by Arnold about the events surrounding the baby's death. Accordingly, the evidence reasonably supports the prosecutor's characterization of Arnold as a liar.

## B. Use of the "Sierra Lowe Syndrome"

**{¶ 143}** Arnold also complains about the prosecution's use of the phrasing "Sierra Lowe syndrome" to refer to defense witnesses and to defense counsel. Lowe was a witness who admittedly lied during her testimony. The prosecutor referred to another defense witness as a "Sierra Lowe type character" because she could not coordinate the time of her story with that of her boyfriend. Transcript of April and May 2011 Proceedings, Volume XVI, p. 4696. This was not an unfair comparison, as these two defense witnesses (Renee Smith and Bryan Reid) gave contradictory accounts. The prosecution subsequently referred again to Lowe, in reference to a

remark the defense made in closing about a stain on sneakers that had not been tested. The sneakers apparently belonged to Terrell Talley. In this regard, the prosecutor stated:

> There is no blood from this baby on those sneakers. And when the Defense tells you whatever's on the sneakers – the stain is bodily fluid. I don't remember anyone testifying to that. Why did he say that? Because he wants you to think it is from the baby. Why would you do that? It's not true. It certainly wasn't evidence in this courtroom. Who te – who testified to it? Who walked through those doors, and the question was asked, "Is that bodily fluid on the sneakers?" Who was it? What person said that? It's that Sierra Lowe syndrome. *Id*. at p. 4697.

{¶ 144}        The prosecutor's remark about defense counsel was inappropriate. The prosecutor was entitled to comment on the fact that certain matters (and corresponding inferences) were not supported by the evidence, but comments that denigrate defense counsel by characterizing counsel as a liar are "improper and beyond the bounds of reasonable argument." *State v. Roberts*, 139 Ohio App.3d 757, 769, 745 N.E.2d 1057 (1st Dist.2000).

{¶ 145}        However, the defense failed to object to this statement at trial, and we can consider only plain error. *Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093, at ¶ 16. "Plain error is not present unless, but for the error complained of, the outcome of the trial would have been different." *Id.*, citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "A finding of plain error should be made with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *Id.*, citing *Long* at paragraph three of the syllabus.

**{¶ 146}** Under the circumstances, the prosecutor's comment does not present the type of exceptional circumstance that warrants a finding of plain error. The evidence against Arnold was overwhelming, and this error would not have changed the outcome of the trial.

### C. References to Tactics as "Sad" and "Pathetic"

**{¶ 147}** Arnold also contends that the prosecutor improperly referred to defense counsel's tactics as "sad" and "pathetic." The State argues that this comment has been taken out of context, and that the State was referring to Lowe's testimony, not to defense counsel's tactics.

**{¶ 148}** Sierra Lowe was offered as a defense witness to rebut the testimony of State witnesses, Ashley Parks and Jeanyne Hutchins. Parks and Hutchins were incarcerated with Arnold in jail, and testified about incriminating remarks that Arnold made, i.e., that she didn't mean to kill the baby.

**{¶ 149}** Lowe was also present in the jail during these conversations. Lowe testified that she never heard Arnold say that she did not mean to kill the baby. Instead, Lowe testified that Parks had stated that "they" knew that Arnold had killed her baby and that she (Parks) had heard Arnold state that. In response, Arnold said, "No, you could not have, because I've never discussed my case." Transcript of April and May 2011 Proceedings, Volume XIV, p. 4211. Lowe also testified about remarks that Parks had made about finding a way to get Arnold to incriminate herself, so that Parks could incur favor and be released from jail.

**{¶ 150}** During cross-examination, Lowe was asked whether she knew another woman, Kimberly Hunter, who was also present in the jail when Arnold's alleged incriminating remarks were made. *Id.* at p. 4215. Lowe denied knowing Hunter before her incarceration,

when testimony from the 2008 trial indicated that she had known Hunter since she (Lowe) was about ten years old. *Id.* at pp. 4213, 4215-4218. The defense did not call Hunter as a witness.

{¶ 151} In closing, the prosecutor made the following argument:

The defendant wrote this play. On August 30th of '05, when she baked baby Paris for at least two minutes in this microwave oven. Without knowing it, she chose the players. She chose you. And she chose us, and them. And here we are, after the first question at the hospital was, "How did this baby get burnt?" And the next question, "Who did it and how?" She wrote this play. She chose all the witnesses.

Sierra Lowe. Well, you know, they got me on what I said at the jail and I'll bring in two people, one of which knew her. And Sierra Lowe's on the stand, took an oath to tell the truth on this witness stand (indicating), swore to God and country to tell the truth, and you all saw what happened. Lie, lie, lie, lie, lie. And then she gets her friend, Kim Hunter, who she claimed she doesn't know. She's known her since she was 10 years old and between Kim Hunter and Sierra Lowe, they think they're going to knock Ashley and Jeanyne out of the box. They don't even bother bringing Kim Hunter in anymore. That was so sad. It was –

Mr. RION. Objection.

Mr. FRANCESCHELLI: – pathetic. Transcript of April and May 2011 Proceedings, Volume XVI, pp. 4690-4691.

{¶ 152} The trial court overruled the objection. From reading the passage, it is unclear whether the prosecutor is referring to Sierra Lowe's attempts to construct a story as sad

and pathetic, or whether the comment refers to the defense's failure to call Hunter to support Lowe's story. Since Hunter did not testify at the trial, we have no idea (nor did the jury) of what Hunter would have said, nor is there any indication that either Hunter or Lowe knew Arnold prior to being incarcerated with Arnold.

{¶ 153} In addition, the relevance of the fact that Lowe lied about having known Hunter before they were in jail, is unclear – other than the simple fact that Lowe's denial of an obvious fact reflected poorly on her credibility. In light of these facts and lack of clarity in the prosecutor's comments, we cannot find that the prosecutor's arguable misconduct "so infected the accused's trial with unfairness that the accused's convictions came in violation of the right to due process." *Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093, at ¶ 15, citing *Donnelly,* 416 U.S. at 644, 94 S.Ct. 1868, 40 L.Ed.2d 431.

### D. Comments Vouching for the Honesty of a Witness

{¶ 154} The next alleged incident of misconduct occurred when the prosecutor stated, regarding State witness, Robert Copeland, that Copeland was "honest." Transcript of April and May 2011 Proceedings, Volume XVI, p. 4698. Copeland was one of two witnesses who furnished Terrell Talley with an alibi during the time that Paris was killed. According to these witnesses, Talley was at the "Spot," or the drug house, during the relevant time period. Regarding these witnesses, the prosecutor stated that:

> All I know is, Terrell's at that Spot, Copeland and Turner had no reason to lie
>
> about that. I don't think Mr. – with all due respect to Mr. Copeland, he seems a
>
> very nice man, probably would rather be home doing something else than coming

here to court, but he was honest with you. You can't put words – and you certainly put words into his mouth. He wasn't going to let any lawyer do that. You saw that. And even with the transcript when he's being accused of saying X when he really said Y. He says what he says. And he doesn't much care about you all putting – anybody putting words in his mouth. That's just not going to happen because he was honest about it. He knew he sat there with Terrell after his son went to bed, and they drank, and whatever they did – partied. *Id.* at pp. 4697-4698.

**{¶ 155}** "Commenting on the truthfulness of a witness is not proper." *State v. Clay*, 181 Ohio App.3d 563, 2009-Ohio-1235, 910 N.E.2d 14, ¶ 45 (8th Dist.), citing *Smith*, 14 Ohio St.3d at 13, 470 N.E.2d 883. However, Arnold failed to object to this statement, and again, we review for plain error. As before, we cannot find that the outcome of the trial would have been different, but for the error.

### E. Alleged Name-Calling

**{¶ 156}** Arnold's next assertion of misconduct relates to alleged name-calling, when the prosecutor sarcastically referred to Arnold as "Mother of the Year." Transcript of April and May 2011 Proceedings, Volume XVI, p. 4679. The Supreme Court of Ohio has noted, with respect to name-calling that "[w]hile a prosecutor may not make excessively emotional arguments tending to inflame the jury's sensibilities, the prosecutor is entitled to some latitude in making a closing argument to the jury. 'Realism compels us to recognize that criminal trials cannot be squeezed dry of all feeling.' " *State v. Tibbetts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001),

quoting *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993).

{¶ 157}        In *Tibbets*, the court concluded that most of the prosecutor's comments, including referring to the defendant as a "coward" and a "trained killer" were fair comment on the evidence, and "were aimed at describing the purposeful and brutal nature of [the defendant's] acts."  *Id*. at 168-169.  The court concluded that defense counsel could have objected to a reference to the Mafia in connnection with the defendant, but found that the remark was isolated and did not deny the defendant a fair trial.  *Id*. at 169.

{¶ 158}        Arnold did not object to the description of her mothering ability, and we review for plain error.  Again, we find no plain error that would warrant reversal.  In view of the nature of the crime, the prosecutor's reaction is understandable.

## F.   Reference to Evidence Outside the Record

{¶ 159}        Arnold next challenges the prosecution's reference to evidence outside the record concerning a Virginia case, in which a baby had also been microwaved.  In this regard, the prosecutor stated that:

> And only one defendant is in that house. You know it's the defendant, and the
>
> second question is answered.  Who did it?  The defendant did it.  And if you
>
> don't think a mother would do that, I've never heard of it either.  But Dr. Fierro
>
> had.    Transcript of April and May 2011 Proceedings, Volume XVI, p. 4705.

{¶ 160}        At this point, defense counsel objected, and the trial court sustained the objection as to the perpetrator for the Virginia case, because the perpetrator's identity had not been introduced into evidence.  *Id*.  The prosecutor then said, "I appreciate that.  Having said it,

we know it happens, because Dr. Fierro had a microwave baby case. Baby Martinez. Who would have ever thought." *Id*.

{¶ 161}     We previously noted that the prosecution may not allude to matters outside the record. *Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, at ¶ 19, citing *Smith*, 14 Ohio St.3d at 14, 470 N.E.2d 883. Thus, the prosecutor's comment was improper. However, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093, at ¶ 15, quoting *Smith*, 455 U.S. at 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 162}     Although the prosecutor erred in referring to evidence outside the record, we have reviewed the entirety of the transcript, and find that Arnold was not deprived of a fair trial. This was an isolated incident, and the jury was instructed that the evidence did not include the statements of counsel. Transcript of April and May 2011 Proceedings, Volume XVI, p. 4709.

G.     Personal Opinion and Commentary on Evidence

{¶ 163}     According to Arnold, another area of misconduct occurred when the prosecutor discussed Arnold's statement to police in response to a question about whether there were any dry heat sources in her home. The first object that Arnold mentioned was a microwave. Arnold also did not deny that the baby had been killed in a microwave.

{¶ 164}     During closing argument, the prosecutor made the following remarks:

> In the end, she's asked, "You the primary caretaker, you the only one doing
> it that night?" "Yes." "You're there. You don't deny the baby was killed in a

microwave oven." "No." And she tipped her hand when she was asked at the police station on August 30th when the police asked, "What kind of dry heating instruments do you have in your home?" I never would have thought of this, and she lists the microwave as the number one answer.

        * * *

And then when – when Doyle Burke who's been a seasoned homicide detective for I forget how many years, walked past that – this microwave, I don't know how many times, and the thought had never entered his mind. Transcript of April and May 2011 Proceedings, Volume XVI, pp. 4705-4706.[2]

{¶ 165} The prosecutor should not have inserted his own opinion about what would or not have entered his mind, as he was not a witness, and his personal belief on the subject invaded the jury's province. *Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162, at ¶ 19. Arnold did object to the prosecutor's statement. Nonetheless, for the reasons previously mentioned, Arnold was not deprived of a fair trial. Furthermore, in light of the fact that the police did not examine the microwave oven at the time of the crime, and only came to the conclusion that a microwave oven had been used until many months later, it would have been obvious to the jury that a reasonable individual would not have thought of a microwave as the instrument that caused the baby's injuries.

---

[2] The prosecutor also misstated a fact when referring to the date on which Arnold made the statement about the microwave oven as a heat source. According to the testimony of Detective Beane, the statement was made in an interview on November 27, 2006, when Arnold was questioned and then arrested for aggravated murder. At the time of this interview, nothing had been released regarding a microwave oven.

## H.   Calls for "Justice"

{¶ 166}        Arnold's final challenge to the State's closing argument focuses on the prosecutor's call for "justice."   In this regard, the prosecutor stated that:

The People have proved its case beyond a reasonable doubt. * * * Stay on the right path.   Don't go down some other trail, because if you do, you'll never find the truth.   If you don't find the truth, you can't do justice.

Baby Paris needs justice.   All of those little side events, all those issues the Defense wants you to think about will get you away from what happened on August the 30th, 2005, at 2:00 or so a.m. in the morning.   And if they stop you from thinking about that time, on that date, at 415 Hall, and this baby was microwaved in this microwave oven, you'll never find the truth, and there will never be justice.   Transcript of April and May 2011 Proceedings, Volume XVI, p. 4706.

{¶ 167}        The prosecutor did not act improperly in making these remarks.   "A prosecutor may legitimately call for justice or ask jurors to do their duty."   *State v. Jefferson*, 2d Dist. Greene No. 2002 CA 26, 2002-Ohio-6377, ¶ 18, citing *State v. Bey*, 85 Ohio St.3d 487, 494, 709 N.E.2d 484 (1999).

{¶ 168}        In conclusion, although there were some instances of improper remarks by the prosecutor, we conclude, after a review of the entire record, that the prosecutor's misconduct did not so infect "the accused's trial with unfairness that the accused's convictions came in violation of the right to due process."   *Jeffery*, 2013-Ohio-504, 986 N.E.2d 1093, at ¶ 15, citing *Donnelly,* 416 U.S. at 644, 94 S.Ct. 1868, 40 L.Ed.2d 431.   Accordingly, Arnold's Fifth

Assignment of Error is overruled.

## VII.   Conclusion

**{¶ 169}**          All of Arnold's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN, P.J. and HALL, J., concur.

Copies mailed to:

Mathias H. Heck
Andrew T. French
Christopher W. Thompson
Hon. Mary Lynn Wiseman