[Cite as *State v. Bump*, 2016-Ohio-4717.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CHAMPAIGN COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2015-CA-10 |
| | : | |
| v. | : | T.C. NO. 14CR262 |
| | : | |
| JOHN C. BUMP | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

· · · · · · · · · ·

**O P I N I O N**

Rendered on the ___30th___ day of __June___, 2016.

· · · · · · · · · ·

JANE A. NAPIER, Atty. Reg. No. 0061426, Assistant Prosecuting Attorney, 200 N. Main Street, Urbana, Ohio 43078
        Attorney for Plaintiff-Appellee

JULIA B. PEPPO, Atty. Reg. No. 0037172, 117 S. Main Street, Suite 400, Dayton, Ohio 45422
        Attorney for Defendant-Appellant

· · · · · · · · · · · ·

FROELICH, J.

{¶ 1} John C. Bump was found guilty by a jury in the Champaign County Court of Common Pleas of one count of domestic violence in violation of R.C. 2919.25(A)/(D)(4) (two or more prior offenses), a felony of the third degree.   The trial court sentenced him

to three years of community control.   Bump appeals from his conviction.

## I.   Procedural History

{¶ 2}   On October 27, 2014, Bump was charged with domestic violence, with two or more prior offenses, after police responded to his residence in Urbana and found a woman bleeding.   On November 6, 2014, he was indicted on the same charge.   Bump filed a notice of intent to assert an affirmative defense at trial, namely self-defense, and he stipulated prior to trial that he had two prior adjudications as a juvenile for domestic violence.   On January 20, 2015, Bump was tried by a jury and was found guilty.   On March 6, 2015, Bump was sentenced to three years of community control; the conditions of community control included completion of the West Central residential program, counseling and anger management counseling, 75 hours of community service, and paying a fine of $250, as well as court costs and court-appointed legal fees.

{¶ 3}   Bump filed a timely notice of appeal and filed a brief in which he raised four assignments of error.   The State filed its appellee's brief, and Bump filed a reply brief. More than one month after his reply brief was filed, with permission of this court, Bump filed an "Amended Assignment of Error," which expanded on one of the previously enumerated assignments and added an additional one.   The State filed a response to the expanded and new arguments.[1]

{¶ 4}   We will address Bump's assignments of error in an order that facilitates our discussion.

---

[1] In its responsive brief, rather than in a separate motion, the State asks that we strike the Amended Assignment of Error because it was not filed within the 20-day period provided in our January 21, 2016, Decision and Entry.   (It was filed 26 days later.)   We overrule this request.

## II.    Weight of the Evidence

{¶ 5}   In his fourth assignment of error, Bump contends that the jury's verdict was against the manifest weight of the evidence.   In support of his argument, he references questions submitted to the court by the jurors after the testimony of the complaining witness, A.B.   He characterizes these questions as showing that the jury was "uncomfortable with the concept of [Bump] and [A.B.] being boyfriend and girlfriend and cohabiting under the definition of the R.C. 2919.29."   The definition of a "family or household member" to which Bump refers is actually set forth at R.C. 2919.25(F)(1).

{¶ 6}   The evidence presented at trial was as follows.

{¶ 7}   A.B., age 19, the alleged victim of the domestic violence, testified that she met Bump online in March 2014 through Chatango, a social networking site.   At the time, A.B. was in Akron and homeless; she was interested in finding a "boyfriend" and a place to stay, and she posted statements to this effect on the website.   After about one hour, Bump started a conversation with A.B. through the website, asked if she really needed a place to stay, and asked A.B. to come to Urbana to live with him; he stated, however, that she could only stay for a short time and would have to lie to his father about where she lived.   A.B. could not recall why Bump wanted her to lie to his father.   Bump and his father drove to Akron and picked A.B. up at the airport.

{¶ 8}   Although A.B. and Bump had not discussed the nature of their relationship prior to her arrival in Urbana, they discussed it the night of her arrival.   Bump asked A.B. if she wanted to be his girlfriend, and she agreed.   They began a sexual relationship and stayed in Bump's apartment for a week, at which point Bump told A.B. she had to leave. She went to Columbus and then to Zanesville to stay with friends before returning to

Akron to live with her parents. She kept in touch with Bump through occasional texting.

{¶ 9} In October 2014, Bump asked A.B. to come back to Urbana. A.B. thought this visit would be for a more extended time. On October 10, she arrived by Greyhound bus in Springfield, where she was picked up by Bump and his father. A.B. testified that she and Bump got along fine for a couple of weeks, resumed their sexual relationship, and again spent most of their time in Bump's apartment.

{¶ 10} According to A.B., on October 24 or 25, Bump left the apartment to stay with a friend in Springfield, apparently without explanation. He did not ask A.B. to leave and, in fact, told her she could stay. On October 26, A.B. did not feel well, and Bump was not responding to her texts. She had a male friend in Springfield, and she asked him for help, specifically to bring her some food and ginger ale at Bump's apartment. The friend did so and, according to A.B., her friend only stayed at the apartment for five minutes. A.B. also asked the friend to text Bump, because Bump was not responding to her texts. (The friend and Bump did not know one another.) It is unclear from the record when these texts were sent or what was said, but the texts made Bump aware of A.B.'s friend's visit to the apartment.

{¶ 11} On October 27, 2014, Bump returned to the apartment in the early afternoon; he was "very angry" with A.B., and he told A.B. that she needed to leave. According to A.B., Bump was loud and yelling and, as she tried to get dressed, he told her that she had five seconds to leave. Bump apparently believed that A.B. and her male friend from Springfield were "more than friends." Bump hit A.B. in the face with an open hand "really hard"; A.B. stated that she did not hit him back. She went to the floor, crying. Bump then called 911, claiming that A.B. would not leave and that she was trying to start

a fight. He also began to throw her belongings out the front door of the apartment onto the driveway.

{¶ 12} The 911 recording was played at trial, and A.B. identified the crying voice in the background as her own. When asked why Bump was saying to get off of him, A.B. explained that she had tried to put her hand on Bump's shoulder to calm him down and to hug him; she stated that she was not trying to cause him harm.

{¶ 13} According to A.B., after the 911 call ended, Bump "grab[bed]" her by the wrist, "tosse[d]" her on the floor, and started "jerking" her by her hair and dragging her toward the door. Bump asked why A.B. did not go with the friend she had called, and he punched her in the face with a closed fist, striking the bridge of her nose. She fell to the ground and struck her face on the ground; when she put her hand to her face, she "saw nothing but blood." She testified that she sustained a large cut across her nose, a concussion, bruised lip and ribs, and a chipped tooth.

{¶ 14} At the beginning of her testimony, when asked if she had any medical conditions that made it difficult for her to understand counsel's questions, A.B. stated that she has Asperger's syndrome, which she described as "a high functioning of autism" that "makes [it] hard to understand certain questions."

{¶ 15} On cross-examination, A.B. remembered another trip to Urbana in May, 2014, for one week, and she testified that her October 2014 trip was actually the third time she had visited Bump. She testified that, on the first two trips and the majority of the third trip, she and Bump had gotten along fine, that they had considered themselves boyfriend and girlfriend, and that they had said they loved each other.

{¶ 16} The 911 dispatcher who handled the call from Bump on October 27, 2014,

testified that Bump was "complaining about an unwanted guest" and used an "angry" tone. She further testified that he was not "very forthcoming with information" in response to her questions, then he hung up.

{¶ 17} Urbana Police Officers Shawn Schmidt and Steve Molton also testified at trial. Molton was the first officer on the scene; he found Bump "agitated" and "excited" and saw A.B. lying on the floor of the apartment, crying "[a]lmost to hysterical." Molton handcuffed Bump and placed him in the cruiser, then went to assist A.B. while waiting for backup and medical assistance to arrive. Molton testified that Bump did not have any blood on him, and that Bump asserted that he had acted in self-defense. Molton also testified that A.B. referred to Bump as her "boyfriend" during this encounter; he could not recall whether Bump had referred to A.B. as his girlfriend. Molton stated that A.B. had not reported at that time that Bump had dragged her by her hair, because that information was not in his report.

{¶ 18} Schmidt was the second officer on the scene. When he arrived, he observed belongings strewn across the driveway and saw Officer Molton caring for A.B. inside the apartment. According to Schmidt, A.B. was very upset, crying, and bleeding; she had blood all over her face, there were drips of blood on the floor in the hallway, and there was "a puddle or a pool of blood with drips around it" in the back room. Schmidt described the amount of blood as "considerable" and indicative of "substantial injury." A.B. stated to Schmidt that Bump was upset because she had called a friend over to the apartment the previous night and he thought she was cheating; she also stated that Bump had slapped and punched her.

{¶ 19} Schmidt also talked with Bump, who he described as "agitated" and "very

excited." Bump stated that A.B. "had trespassed his trust by inviting somebody over" and that he had asked her to leave several times when he returned to the apartment, but she did not. Bump also stated that he thought the police were "stalling" and "harassing him" when he called 911, because they tried to "keep him on the phone when he was just trying to get somebody to leave his property." Bump stated that, after he had asked A.B. to leave and thrown some of her "stuff" outside, she "tried to face-plant him into the stove," and he defended himself by pushing her off of him.

{¶ 20} Bump did not call any witnesses at trial or testify on his own behalf. Although Bump had filed a notice of intent to assert an affirmative defense of self-defense, Officer Schmidt's brief statement about A.B.'s attempt to "face-plant" Bump and Bump's assertion to Officer Molton at the scene that he had acted in self-defense were the only evidence offered on this point.

{¶ 21} When reviewing an argument challenging the weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.).

{¶ 22} R.C. 2919.25 provides, in pertinent part:

(A) No person shall knowingly cause or attempt to cause physical harm to

a family or household member.

* * *

(F)(1) "Family or household member" means any of the following:

a) Any of the following who is residing or has resided with the offender:

(i) A spouse, a person living as a spouse, or a former spouse of the offender;

* * *

(2) "Person living as a spouse" means a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.

**{¶ 23}** Bump's argument that his conviction was against the manifest weight of the evidence is focused on whether the jury reasonably concluded that A.B. was his "family or household member." In particular, he focuses on questions submitted to the court by the jurors, at the court's invitation, at the end of A.B.'s testimony. These questions focused on: 1) how she had forgotten that she came to Urbana three times instead of two; 2) A.B's reason for moving out of other places, such as Zanesville; 3) whether she had ever discussed her "Asperger condition" with Bump; 4) the identity of the "friend who lives in Urbana [sic]," how she knew him, and the nature of their relationship; 5) what she thought would happen to her apartment in Akron (in October) if she stayed in Urbana for an extended time; 6) what was her "state of mind" when she asked her friend to bring soda; 7) whether she and Bump had any physical altercations during her May visit; and 8) how she knew she had Asperger's, and what were its

characteristics "as related to the case." The trial court asked A.B. questions (1) – (6), but did not ask questions (7) – (8).

**{¶ 24}** Bump asserts in his brief that these questions suggest the jury was "clearly * * * uncomfortable with the concept of [Bump] and [A.B.] being boyfriend and girlfriend and cohabiting" for purposes of the definition of a family or household member. However, most of the questions cannot reasonably be interpreted to relate to the status of their relationship. Moreover, even the ones that do touch upon the nature of the relationship – for example, what was happening with her Akron apartment and the nature of the relationship with the friend in Springfield -- did not represent "a common mindset of a group of people," as Bump suggests. These were the questions of individual jurors, and not the result of collective discussion. *See* Crim.R. 24(J)(3) (prohibiting jurors from discussing a proposed question with other jurors). While these questions may reflect some jurors' curiosity about various aspects of the case, they cannot reasonably be construed as demonstrating reasonable doubt about the nature of A.B. and Bump's relationship, especially in light of the jurors' subsequent finding of guilt, which required them to unanimously agree that A.B. and Bump had been cohabiting as family or household members.

**{¶ 25}** Based on the evidence presented, we cannot conclude that the jury "clearly lost its way" or created a "manifest miscarriage of justice" in convicting Bump of domestic violence.

**{¶ 26}** The fourth assignment of error is overruled.

### III.    Leading Questions

**{¶ 27}** In his first assignment of error, Bump asserts that the prosecutor's direct

examination of A.B "consisted almost exclusively of leading questions," in violation of Evid.R. 611(C), and that this conduct amounted to prosecutorial misconduct and plain error. Bump did not object to the leading nature of any of the questions, but the court did, at one point at sidebar, instruct the prosecutor to avoid the use of such questions.

{¶ 28} Evid.R. 611(C) provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." The broad exception contained in Evid.R. 611(C) -- when leading questions "may be necessary to develop the witness' testimony" -- places the decision of whether to allow leading questions within the sound discretion of the trial court. *State v. Jackson,* 92 Ohio St.3d 436, 449, 751 N.E.2d 946 (2001). *State v. Davis*, 2d Dist. Clark No. 08CA0117, 2010-Ohio-5279, ¶ 26.

{¶ 29} In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 30} Bump's assertion that the prosecutor used leading questions "almost exclusively" is not borne out by the record. However, there were a few points at which the prosecutor lapsed into a series of leading questions. For the most part, these questions did not supply testimony and did not "[form] a substantial part of the witness' performance," as was the concern in some of the cases on which Bump relies. *See, e.g., State v. Poling*, 11th Dist. Portage No. 2004-P-0044, 2006-Ohio-1008, ¶ 27.

Understandably, leading questions are less problematic when they are interspersed with other questions which require a witness to provide additional information, as was the case here. *See State v. DeBlasis,* 8th Dist. Cuyahoga No. 81126, 2004-Ohio-2843, ¶ 45.

{¶ 31} The series of leading questions on which Bump primarily focuses his argument – and which the court interrupted sua sponte – occurred during redirect examination, when counsel sought to review points about which A.B. had already testified. This review of prior testimony through leading questions, while inappropriate in form, was not prejudicial to Bump and thus did not constitute plain error. The prosecutor's occasional use of leading questions in other portions of A.B.'s testimony, which was interspersed with questions where she was required to provide substantive information, also did not amount to plain error.

{¶ 32} Bump also objects to the prosecutor's "looping back around and rehabilitating by his leading questions of [A.B.] in order to get her to tell the story he needed her to tell to meet the elements of the crime," namely, to state that A.B. and Bump "had a relationship." This argument focuses specifically on A.B.'s testimony about when the relationship began. She testified, in various ways, that they were "dating" in March and that their boyfriend-girlfriend relationship began the first night of her March visit. Her testimony was consistent that they had not discussed a relationship before she arrived for the first time, but they did so shortly after her arrival. We are unpersuaded that the prosecutor improperly "looped" back to this issue, thereby creating a "travesty" or "chang[ing] the testimony of [A.B.] by attacking it with another leading question." Moreover, insofar as these questions related to the status of the relationship at its outset, more than six months before the alleged offense and the relevant determination of the

status of the relationship, their relevance to the ultimate issues in the case is doubtful.

{¶ 33} We note that the State argues in its brief that "more leading or pointed questions may have been necessary" in this case, based on A.B.'s testimony that her Asperger's syndrome made it difficult for her to "understand certain questions." However, neither party elicited additional information about A.B.'s diagnosis, and it is not apparent from the record that A.B. had any trouble understanding questions from either party. While the trial court *might* permit some leading questions "as * * * necessary to develop the witness's testimony" based on a witness's medical diagnosis in certain circumstances, there is no indication in the record that the trial court considered this factor here. And, insofar as Bump did not object to any of the leading questions, the State was not called upon to justify their use, and the court was not required to rule on whether Asperger's warranted the use of leading questions. The first assignment of error is overruled.

## IV.    Prosecutorial Misconduct

{¶ 34} In his second assignment of error, Bump argues that prosecutorial misconduct deprived him of his right to a fair trial. He further asserts that his "case should be dismissed with prejudice," and that he cannot be retried because he may not be twice placed in jeopardy for the same offense.

{¶ 35} The test for prosecutorial misconduct is whether the prosecutor's remarks or questions were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Exon*, 2d Dist. Clark No. 2014-CA-106, 2016-Ohio-600, ¶ 40, citing *State v. Jones,* 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000). A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the

defendant of a fair trial. *State v. Williams*, 2d Dist. Montgomery No. 24548, 2012-Ohio-4179, ¶ 51, citing *State v. Apanovitch,* 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). The focus of the inquiry is on the fairness of the trial, not on the culpability of the prosecutor. *State v. Bey,* 85 Ohio St.3d 487, 496, 709 N.E.2d 484 (1999).

{¶ 36} A defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it establishes defendant's guilt, such that the outcome of the case would have been the same regardless of evidence admitted erroneously. *Exon* at ¶ 40; *State v. Williams,* 38 Ohio St.3d 346, 528 N.E.2d 910 (1988). "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *United States v. Hasting,* 461 U.S. 499, 508-509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

{¶ 37} The specific bases for Bump's argument that prosecutorial misconduct deprived him of a fair trial are 1) the leading questions discussed above, and 2) the prosecutor's comments during closing argument about Bump's motivation for inviting A.B. to his house. We have already addressed the prosecutor's use of leading questions and concluded that the questions, though some were improperly phrased, did not affect Bump's right to a fair trial or amount to plain error. We similarly conclude that the leading questions did not affect the fairness of the trial or Bump's substantial rights.

{¶ 38} The portion of the prosecutor's closing argument to which Bump objects occurred during rebuttal, after the prosecutor reminded the jury of the length of A.B.'s October visit, the fact that she was invited by Bump, that Bump had not imposed a time limit for this visit at the outset as he had with the previous visits, and that A.B. considered

Bump to be her boyfriend in an ongoing relationship. The prosecutor noted that, in October 2014, Bump kicked A.B. out after 17 days, and A.B. did not understand why. The prosecutor then stated:

Is this – is this defendant the good samaritan of the year? Ask yourself, what would a 21-year-old guy sitting in his apartment in Urbana, Ohio, want with a 19-year-old female who is homeless at the outset in Akron, Ohio? Does he really want you to believe that he was doing this out of the goodness of his heart? Why would a guy 200 miles away log into Chatango and find some random person only to invite them to come down and stay at his house out of the goodness of his heart? Or did he have other intentions?

The state would submit to you that the evidence submitted demonstrates that he did have other intentions. He was interested in [A.B.], and he communicated that interest.

**{¶ 39}** Bump argues that this statement was "inflammatory" and that it was a "personal assault of the Appellant's character."

**{¶ 40}** As a general rule, a prosecutor is entitled to a certain degree of latitude during closing argument. *State v. Brown,* 38 Ohio St.3d 305, 528 N.E.2d 523 (1988); *State v. Arnold*, 2013-Ohio-5336, 2 N.E.3d 1009, ¶ 137 (2d Dist.). Moreover, closing arguments must be viewed in their entirety to determine whether the disputed remarks were prejudicial. *Arnold* at ¶ 137.

**{¶ 41}** Bump does not articulate in what manner he believes that the quoted portion of the argument assaulted his character. Read in context, it is apparent that the

prosecutor was recounting the evidence offered in support of a finding that Bump and A.B. were in a relationship. The undisputed evidence (which had already been discussed by the prosecutor in closing and in rebuttal) was that A.B. had visited Bump several times, that they spent almost all of their time together during these visits, that they expressed love for one another, and that they engaged in a sexual relationship throughout each of these visits. A.B. had been staying at Bump's apartment for more than two weeks when the alleged domestic violence occurred. Based on this evidence, the prosecutor argued to the jury that there was no other reasonable explanation but that Bump and A.B. were in a relationship (i.e., that they were "family or household members," as required for a domestic violence conviction). Viewed in context, we cannot conclude that these statements were "inflammatory," that they exceeded the latitude afforded a prosecutor during closing argument, or that they unfairly impugned Bump's character.

{¶ 42} The second assignment of error is overruled.

## V. Reliance on Juvenile Adjudications to Enhance the Degree of the Offense

{¶ 43} In his fifth assignment of error, Bump contends that the use of his juvenile adjudications for domestic violence to establish the existence of prior offenses violated his constitutional rights, because he pled to the juvenile charges "without the benefit of the constitutional protections afforded to adults charged in identical charges."

{¶ 44} Pursuant to R.C. 2919.25(D), domestic violence is a misdemeanor of the first degree unless the offender has prior convictions. If the defendant has one prior offense, domestic violence is a felony of the fourth degree; with two or more prior offenses, it is a felony of the third degree.

{¶ 45} This court addressed this issue in *State v. Hand*, 2d Dist. Montgomery No.

25840, 2014-Ohio-3838. Relying on *State v. Craver*, 2d Dist. Montgomery No. 25804, 2014-Ohio-3635, we rejected the argument that, because an accused is not afforded a jury trial in juvenile court and is not advised of the collateral consequences of accepting responsibility, treating a delinquency adjudication as a prior conviction for purposes of an enhanced penalty violates due process. *Craver* at ¶ 7-16. We also held that a prior delinquency adjudication falls within the prior-conviction exception set forth in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), as long as the juvenile adjudication is "sufficiently reliable." *Id.*; *see also* R.C. 2901.08; *State v. Parker*, 8th Dist. Cuyahoga No. 97841, 2012-Ohio-4741.

**{¶ 46}** As Bump points out, the Supreme Court of Ohio accepted an appeal of our judgment in *Hand* in March 2015, to consider the use of juvenile adjudications to enhance penalties for subsequent offenses. Ohio Sup.Ct. No. 2014-1814, 2015-Ohio-1099. The case was argued on December 1, 2015. Nonetheless, based on our holdings in *Hand* and *Craver*, we do not accept Bump's argument that such reliance on juvenile court adjudications is improper.

**{¶ 47}** The fifth assignment of error is overruled.

## VI. Ineffective Assistance of Counsel

**{¶ 48}** In his third assignment of error, Bump argues that he was denied the effective assistance of counsel in the following ways: 1) counsel's failure to object to the prosecutor's leading questions; 2) counsel's failure to object to the prosecutor's "misrepresentation" of A.B.'s testimony and to request a mistrial on that basis; 3) counsel's failure to object to the prosecutor's disparagement of Bump's character during closing argument; 4) counsel's failure to request a lesser included offense instruction on

assault; 5) counsel's failure to offer evidence of self-defense; 6) counsel's failure to move to dismiss the case at the close of the State's case; and 7) counsel's failure to request a judgment notwithstanding the verdict. In his amended brief, Bump also argues that counsel was ineffective in stipulating to Bump's juvenile adjudications for domestic violence and in failing to challenge the use of these convictions to enhance his sentence.

{¶ 49} To establish the ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and fell below an objective standard of reasonable representation, and that the defendant was prejudiced by counsel's performance. To succeed on such a claim, there must be a reasonable probability that, but for counsel's unprofessional errors, the result of the defendant's trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

{¶ 50} We have already addressed the prosecutor's leading questions and the alleged disparagement of Bump's character during closing argument. We rely on our discussion, above, in concluding that counsel's failure to object in these instances did not fall below an objective standard of reasonableness and did not affect the outcome of Bump's trial. We also disagree with Bump's assertion that his attorney's failure to object to the prosecutor's efforts to clarify and reinforce A.B.'s testimony about the nature of her relationship with Bump at various times (the alleged "looping" discussed above) constituted ineffective assistance or that it warranted a request for a mistrial. Moreover, insofar as we held in *Hand* that a juvenile adjudication could be used to enhance the penalty for a subsequent offense, counsel was not ineffective in failing to raise that issue, as alleged in the amended brief.

{¶ 51} With respect to counsel's failure to request a lesser included offense instruction on assault, we note that the following events occurred at trial: When the court instructed the jury prior to the start of its deliberations, it did not give an instruction on the lesser included offense of assault, and the parties did not bring this omission to the court's attention. It is unclear from the record whether either party had requested such an instruction. After deliberation had begun, the court called the attorneys back into the courtroom outside the presence of the jury, and informed counsel that the court believed a lesser included instruction should have been given to the jury (along with a corresponding additional verdict form) and that its failure to do so was "not harmless." The jury was called back into the courtroom, and new jury instructions were provided orally and in writing, which were reviewed with the jurors. The court also told the jurors that they should "not make any inference as to why the court is including [the lesser included offense instruction] now," emphasizing that it should have been given at the outset.

{¶ 52} Even if defense counsel arguably acted ineffectively in failing to request the lesser included offense instruction on assault (which corresponded with the defense theory of the case that A.B. was not a family or household member of Bump's), any prejudice that may have flowed from this omission was corrected by the trial court's giving of the instruction. Moreover, A.B.'s relationship with Bump was an untraditional one but, as stated above, we cannot find that the jury lost its way in concluding that Bump and A.B. were family or household members. Thus, we conclude that counsel's failure to request an instruction on the lesser-included offense did not affect the outcome of the case.

{¶ 53} Bump also argues that counsel was ineffective in failing to offer evidence of self-defense, after mentioning it in her opening statement, and in failing to ask that the jury instruction on self-defense be withdrawn.

{¶ 54} Counsel's opening statement with respect to self-defense included the following: "While [A.B.] was asking my client to let her stay, she got physical with him. He pushed her off of him, and she fell and was injured. My client isn't going to try to hide the fact that [A.B.] was injured * * *." Defense counsel did not use the word "self-defense" during opening statement. The evidence of self-defense offered at trial consisted of: 1) Officer Schmidt's testimony that Bump had stated that he defended himself by pushing A.B. after she tried to "face-plant him into the stove"; 2) Officer Molton's testimony that Bump claimed to have acted in self-defense; and 3) the 911 dispatcher's testimony about and the audio recording of the 911 call, on which Bump was heard to say (to A.B.) "get off of me." Although Bump argues in his brief that counsel was ineffective in not offering more evidence of self-defense, he does not suggest what, if any, additional evidence was available to substantiate his claim. We cannot conclude that counsel was ineffective in failing to present evidence without some reliable indication that such evidence was available. Moreover, because the opening statement referenced self-defense and because some evidence was offered in support of Bump's claim of self-defense, there is no basis for us to conclude that trial counsel was ineffective in allowing the instruction on self-defense to be given, nor is there any basis to conclude that Bump was prejudiced by the giving of the instruction.

{¶ 55} Finally, Bump argues that trial counsel was ineffective in failing to move to dismiss the case at the close of the State's evidence and in failing to request a judgment

notwithstanding the verdict at the end of trial pursuant to Crim.R. 29. A Crim.R. 29 motion is evaluated by an appellate court using the same standard as is used to review a sufficiency of the evidence claim. *State v. White*, 2d Dist. Montgomery No. 25792, 2014-Ohio-1446, ¶ 9, citing *State v. Witcher,* 6th Dist. Lucas No. L-06-1039, 2007-Ohio-3960. "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *Id.*, citing *State v. Crowley,* 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12. To the extent a "motion for judgment notwithstanding the verdict" exists in the criminal context, it relates to the sufficiency of the evidence. *See, e.g., State v. Barnes*, 1st Dist. Hamilton Nos. C-950784 and 950785, 1996 WL 603797, * 3 (Oct. 23, 1996).

{¶ 56} The evidence presented in this case, viewed most favorably to the State, was sufficient to support Bump's conviction of domestic violence. Because motions to dismiss or for "judgment notwithstanding the verdict" under Crim.R. 29 would properly have been overruled, counsel was not ineffective in failing to request that the case be dismissed at the end of the State's case or in failing to request a judgment notwithstanding the verdict.

{¶ 57} The third assignment of error is overruled.

## VII.     Conclusion

{¶ 58} The judgment of the trial court will be affirmed.

. . . . . . . . . . . .

FAIN, J., concurs.

DONOVAN, P.J., concurring:

{¶ 59} My concern is the fifth assignment of error. As noted by the majority, the issue of penalty enhancement with a juvenile adjudication and the due process implications thereof is pending in the Ohio Supreme Court in the *Hand* case. Further, *Hand's* reliance upon *Craver*, an *Anders* case, is inherently unpersuasive. I remain convinced *Hand* was wrongly decided. Nevertheless, it remains the law in the Second District until such time as the Ohio Supreme Court should find otherwise.

. . . . . . . . . .

Copies mailed to:

Jane A. Napier
Julia B. Peppo
Hon. Nick A. Selvaggio